JUDGES: Hon. Cheryl L. Waite, Hon. Mary DeGenaro, Hon. Carol Ann Robb
OPINION
WAITE, J.
*317 {¶ 1} Appellants Donald V. and Julie A. Hogue appeal a November 17, 2016 decision of the Monroe County Common Pleas Court to grant summary judgment in favor of Appellees Roy L. Whitacre, K.L.J., Inc. ("KLJ"), Buckeye Oil Company ("Buckeye"), Clearfork Oil Company ("Clearfork"), Whitacre Oil Company ("Whitacre Oil"), Whitacre Enterprises, Inc. ("Whitacre Enterprises"), AR Ohio L.L.C. ("AR"), and American Energy. Appellants argue that the trial court erroneously determined that a well located on their property produced in paying quantities during a three-year time span. For the reasons provided, Appellants' arguments are without merit and the judgment of the trial court is affirmed.
Factual and Procedural History
{¶ 2} Appellants own 78.5 acres of land in Franklin Township, Monroe County. On January 16, 2006, Appellants entered into an oil and gas lease with Whitacre Enterprises. On July 7, 2006, a single well was drilled on the property. The well produced significant amounts of oil and gas for several years until construction began on a compression station used to produce gas from the well. The details are not clear from the record, but at some point KLJ, Buckeye, and Clearfork obtained an interest in the oil and gas rights.
{¶ 3} On June 2, 2011, Whitacre Enterprises, KLJ, Buckeye, Clearfork, and Whitacre Oil subleased the oil and gas rights to HG Energy. HG Energy then assigned the rights to Hall and Ross Resources. Hall and Ross Resources later merged with AR.
{¶ 4} All gas produced from Appellants' land was transported to a compression station through a pipeline called the "PPP line." The compression station is owned by Dominion Oil and Gas ("Dominion"). Sometime in 2014, Dominion informed Whitacre Enterprises that it was planning to construct a new compression station. In August of 2014, Dominion told Whitacre Enterprises that the compression station would be completed in thirty to forty days. However, Dominion did not begin construction until March of 2015 and the project was not completed until mid-September of 2015. Appellees were finally able to use the compression station in October of 2015. As a result of these issues, Whitacre Enterprises decided to construct a compression station on Appellants' property, which was completed in November of 2015.
{¶ 5} According to production records, Appellees profited by more than $1,000 *318 each year from 2006 until 2012. In 2013, the year before the Whitacre Enterprises' construction began, Appellees received $687.01 in profits. In 2014 and 2015, the construction period, Appellees were left with a loss of -$328.95 and -$231.38. In the following two quarters after construction was completed, Appellees received $1,326.49 in profits.
{¶ 6} On July 13, 2015, Appellants filed a complaint against Appellees, collectively, seeking a declaratory judgment that the lease had terminated on its own terms due to the lack of production and seeking quiet title to Appellees' oil and gas rights. On September 2, 2016, the parties filed competing motions for summary judgment. On September 23, 2016, Appellants filed a motion to strike certain exhibits, however, the trial court did not rule on the motion. On October 7, 2016, Appellees filed a motion for leave to supplement or amend their response to Appellants' discovery. The court also failed to rule on this motion. On November 17, 2016, the trial court granted summary judgment in favor of Appellees. This timely appeal followed.
Summary Judgment
{¶ 7} An appellate court conducts a de novo review of a trial court's decision to grant summary judgment, using the same standards as the trial court set forth in Civ.R. 56(C). Grafton v. Ohio Edison Co. , 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Before summary judgment can be granted, the trial court must determine that: (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most favorably in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party. Temple v. Wean United, Inc. , 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977). Whether a fact is "material" depends on the substantive law of the claim being litigated. Hoyt, Inc. v. Gordon & Assoc., Inc. , 104 Ohio App.3d 598, 603, 662 N.E.2d 1088 (8th Dist.1995).
{¶ 8} "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." (Emphasis deleted.) Dresher v. Burt , 75 Ohio St.3d 280, 296, 662 N.E.2d 264 (1996). If the moving party carries its burden, the nonmoving party has a reciprocal burden of setting forth specific facts showing that there is a genuine issue for trial. Id. at 293, 662 N.E.2d 264. In other words, when presented with a properly supported motion for summary judgment, the nonmoving party must produce some evidence to suggest that a reasonable factfinder could rule in that party's favor. Brewer v. Cleveland Bd. of Edn. , 122 Ohio App.3d 378, 386, 701 N.E.2d 1023 (8th Dist.1997).
{¶ 9} The evidentiary materials to support a motion for summary judgment are listed in Civ.R. 56(C) and include the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact that have been filed in the case. In resolving the motion, the court views the evidence in a light most favorable to the nonmoving party. Temple , 50 Ohio St.2d at 327, 364 N.E.2d 267.
Exhibits B and C
{¶ 10} Much of the following analysis involves two exhibits attached to Appellees' motion for summary judgment, exhibits B and C. The exhibits are charts that summarize Appellees' expenses and profits *319 for the relevant years and were prepared by an accountant, Lisa A. Jones. Appellants argue that these documents should not have been considered by the trial court as they amount to hearsay. Appellees respond by arguing that these exhibits are appropriate in summary judgment pursuant to Evid.R. 1006, because they represent summaries of voluminous records.
{¶ 11} On September 23, 2016, Appellants filed a motion to strike exhibits B and C. As noted by Appellants, the trial court did not rule on this motion. If a trial court has failed to rule on a motion at the time the case is disposed, an appellate court will presume that the motion was overruled. State v. Labiaux , 7th Dist. No. 16 HA 0016, 2017-Ohio-7760, 2017 WL 4220082, ¶ 9, Cherol v. Sieben Invests. , 7th Dist. No. 05 MA 112, 2006-Ohio-7048, 2006 WL 3849907, ¶ 18.
{¶ 12} A motion to strike evidence in a summary judgment motion is reviewed for an abuse of discretion. Miller v. J.B. Hunt Transport, Inc. , 10th Dist. No. 13AP-162, 2013-Ohio-3892, 2013 WL 4807036, ¶ 41, citing Ward v. Summa Health Sys. , 128 Ohio St.3d 212, 2010-Ohio-6275, 943 N.E.2d 514, ¶ 13 ; Bellamy v. Montgomery , 10th Dist. No. 11AP-1059, 2012-Ohio-4304, 2012 WL 4321160, ¶ 7.
{¶ 13} Pursuant to Evid.R. 1006,
The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The court may order that they be produced in court.
{¶ 14} Exhibits B and C were designed as a condensation of a large number of documents related to Appellees' expenses and profits. Contrary to Appellants' assertion, each of the underlying documents were made available to Appellants along with exhibits B and C. See 9/2/16 Appellants' Motion for Summary Judgment, Exhs. 6-9.
{¶ 15} In their motion to strike exhibits B and C, Appellants complain that records for the years 2006 to 2010 and 2016 were not made available. However, Appellants have admitted that production and expense records were made available for the years 2012 to 2015, the only relevant years in this matter. Appellants have not explained why the absence of records from 2006 to 2010 and 2016 affected the trial court's ability to review the production records for the years which are relevant, 2012 through 2015.
{¶ 16} As the exhibits represent a summary of voluminous records and the originals have been made available to Appellants, Appellees complied with Evid.R. 1006. Thus, the exhibits are properly considered evidence in summary judgment. Accordingly, the trial court did not abuse its discretion in denying Appellants' motion to strike exhibits B and C.
ASSIGNMENT OF ERROR NO. 1
THE TRIAL COURT ERRED BY GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS-APPELLEES.
ASSIGNMENT OF ERROR NO. 2
THE TRIAL COURT ERRED BY FAILING TO GRANT SUMMARY JUDGMENT IN FAVOR OF PLAINTIFFS-APPELLANTS.
{¶ 17} Appellants argue that Appellees misrepresented the amount of expenses incurred in operating the well. For instance, Appellants argue that Appellees' expense report omits a $250 monthly fee *320 owed to its managing company, Whitacre Store. Appellants also question an expense category titled "Operating: Direct Expense" and argue that Appellees have not defined this category. Appellants claim that Appellees improperly took credits for the removal of certain equipment and machines. Additionally, Appellants argue that a genuine issue of fact remains as to whether Appellees made reasonable efforts to restore production during a temporary cessation.
{¶ 18} In response, Appellees argue that Appellants are attempting to prove unprofitability through the use of the overheard costs for Whitacre Enterprises' entire business. Appellees urge that the appropriate standard looks solely to the expenses incurred during the production of the relevant well. Appellees contend that Appellants also improperly rely on the initial discovery responses, which were supplemented prior to the trial court's ruling. Finally, Appellees argue that the temporary cessation in production was caused by circumstances outside of their control and the efforts in restoring production were reasonable.
{¶ 19} Due to the nature of Appellants' arguments, the relevant years will be addressed individually. However, the applicable law remains the same. The lease in this case included a two-tiered habendum clause. Pursuant to the habendum clause, the term of the lease was a "period of 1 year(s) from the date hereof, and as much longer as oil or gas is found in paying quantities thereon." (9/2/16 Plaintiff's Motion for Summary Judgment, Exh. 2.)
{¶ 20} The Ohio Supreme Court has defined the term "paying quantities" as the production of "quantities of oil or gas sufficient to yield a profit, even small, to the lessee over operating expenses, even though the drilling costs, or equipping costs, are not recovered, and even though the undertaking as a whole may thus result in a loss." Blausey v. Stein , 61 Ohio St.2d 264, 265-266, 400 N.E.2d 408 (1980).
{¶ 21} A lessee is given discretion to determine whether a well is profitable, however, a good faith standard is imposed on the lessee. Burkhart Family Trust v. Antero Resources Corp. , 7th Dist. Nos. 14 MO 0019, 14 MO 0020, 2016-Ohio-4817, 68 N.E.3d 142, ¶ 18, citing Hupp v. Beck , 7th Dist. Nos. 12 MO 0006, 13 MO 0002, 13 MO 0003, 13 MO 0011, 2014-Ohio-4255, 20 N.E.3d 732. A plaintiff holds the burden of proving that a well is not producing in paying quantities. Burkhart , supra , at ¶ 13, citing Moore v. Adams , 5th Dist. No. 2007AP090066, 2008-Ohio-5953, 2008 WL 4907590.
2012
{¶ 22} As to the well's production in 2012, Appellants argue that the production records fail to define what constitutes a "direct operating expense." Appellants contend that the category is kept intentionally vague in an attempt to obscure the true operating expenses. In support of their argument, Appellants point to a $250 monthly fee that Whitacre Enterprises pays to Whitacre Store. According to Appellants, the fee paid for Whitacre Store's employees, vehicles, and equipment are necessary to operate the well. Appellants argue that the monthly fee adds $3,000 per year to Whitacre Enterprises' expenses and is erroneously excluded from exhibits B and C.
{¶ 23} In response, Appellees argue that a "paying quantities" analysis looks to the expenses and profits only as they pertain to the well at issue. Here, Appellees assert that the monthly Whitacre Store fee applied not only to Appellants' well, but to all wells operated by Whitacre Enterprises. Appellees assert that the operating expenses *321 specific to the Hogue well are as follows: $204.20 for landowner royalties, $17.13 for gas severance taxes, $152.60 for maintenance, and $135.39 for direct operating expenses. Appellees explain that this portion of the Whitacre Store fee pertaining to the Hogue well is included within the direct operating expense category.
{¶ 24} Resolution of this issue depends on the interpretation of exhibits B and C. Exhibit B shows the following operating expenses for 2012: office payroll ($201.53), office lease ($181.95), oil and gas software ($12.20), office expenses ($30.74), office postage ($7.32), professional expenses (legal, IT, finance, safety, consulting) ($73.76), building utilities ($63.71), fire resistant clothing ($24.72), insurance for buildings and vehicles ($100.74), shop and warehouse lease ($1,383.02), furniture and fixtures (equipment and machinery) ($231.31), and vehicles ($553.61). According to the exhibit, the total operating expenses for the year were $3,000. However, this total is divided into two subcategories, direct and indirect expenses. This is where the dispute arises between the parties.
{¶ 25} Appellants argue that the division of these expenses misrepresents the total expenses. In response, Appellees explain that the indirect expenses are paid regardless of the Hogue well's existence and do not contribute to its production. Thus, they should not be used in the "paying quantities" calculation. Among the indirect expenses paid to Whitacre Store are the office payroll, office lease, software, postage, professional services, building utilities, fire resistant clothing, vehicles, and machinery. According to Appellees, the portion of these expenses that related directly to the production of the Hogue well amounted to $133.39.
{¶ 26} There is no Ohio precedent directly addressing whether the "paying quantities" analysis includes indirect expenses such as business overhead costs. However, we recently cited to a Williams & Myers, Oil and Gas Law, footnote which noted that a regulation of the United States Department of Interior has interpreted the term "paying quantities" as "a positive stream of income after subtracting normal expenses, which include royalties and direct operating costs." (Emphasis changed.) Paulus v. Beck Energy Corp. , 7th Dist. No. 16 MO 0008, 2017-Ohio-5716, 2017 WL 2839567, ¶ 54, citing to 6 Williams & Myers, Oil and Gas Law , Section 604.5 (2010), fn. 4.
{¶ 27} Appellants encourage us to apply Paulus to the instant case. While we focused on royalties in Paulus , the Williams & Myers citation is equally applicable, here. Thus, in a "paying quantities" analysis, we look to direct operating costs and exclude any indirect costs that do not contribute to the production of oil or gas.
{¶ 28} This principle accords with rulings in other districts. For instance, a Louisiana appellate court held that overhead costs are generally not considered as operating costs in a "paying quantities" analysis. Menoah Petroleum, Inc. v. McKinney , 545 So.2d 1216, 1221 (LA.App. 2d Cir. 1989). In Oklahoma, the general costs of operating a company are excluded as administrative overhead in determining the cost of production. Mason v. Ladd Petroleum , 1981 OK 73, 630 P.2d 1283, 1286 (Okl.1981). Administrative overhead was defined as "the administrative cost of production alone" which includes expenses such as "the cost of accounting, interest, postage, office supplies, telephone, depreciation of office equipment, and all the other indirect expenses of the oil company regarding production." Id.
{¶ 29} Beginning with the monthly payments to Whitacre Store, we first note the significance of the fact that Whitacre *322 Store, despite being a separate entity, is also owned by Koy Whitacre. Further, the evidence in this matter shows that at least a portion of the payments from Whitacre Enterprises to Whitacre Store do not contribute to the extraction of minerals and other portions pertain to other wells owned by Appellees. According to Appellees, Whitacre Enterprises pays Whitacre Store for maintaining its entire business, which includes wells other than the one at issue in this matter.
{¶ 30} While some of these expenses could be classified as direct operating expenses, Appellants failed to rebut the testimony of Koy Whitacre that these expenses do not pertain to the Hogue well. Whitacre testified that the monthly payments compensate Whitacre Store for operating Whitacre Enterprises' entire business. These expenses do not contribute to the production of oil or gas from the Hogue well and are paid to Whitacre Store regardless of whether the Hogue well is operated.
{¶ 31} As these expenses do not contribute to the production of oil or gas from the Hogue land, Appellees correctly excluded them from the paying quantities analysis. The remaining expenses include: royalty payments, gas severance tax, maintenance, and operating costs directly relating to the production of oil and gas. These expenses were properly included as direct costs of production. Based on these figures, Appellees' profit for 2012 was $1,124.03.
{¶ 32} Appellants next argue that Appellees deflated expenses by adding two "credits" for the removal of two tanks. Appellants argue that these cannot be used to reduce the amount of the total expenses for purposes of determining whether the well produces in paying quantities. In response, Appellees argue that they have not used these credits to reduce expenses. In support of their argument, Appellees cite to exhibits B and C, which do not show such "credit".
{¶ 33} Appellees correctly point out that exhibits B and C do not include a credit for removed machinery. As such, the cost of removing machinery was not calculated into Appellees' "paying quantities" analysis. While Appellants argue that a separate exhibit shows this credit, exhibits B and C demonstrate that Appellees did not use this credit in calculating their $1,124.03 profit. It is apparent from the record that the trial court relied on exhibits B and C in reaching its decision.
{¶ 34} Exhibit C details the total expenses for the year, which includes: $133.39 for direct operating costs, $204.20 for royalty payments, $17.13 for gas severance taxes, and $152.60 for maintenance for a total of $509.32. The exhibit also shows a total gross income of $1,633.35. After subtracting the expenses, Appellees' total profit for 2012 was $1,124.03.
{¶ 35} As the evidence properly submitted in summary judgment demonstrates a profit for the year 2012, the trial court properly determined that the well produced in paying quantities.
2013
{¶ 36} Appellants repeat their argument that Appellees mischaracterized its expenses by dividing them into "direct" and "indirect" expenses. As previously discussed, the direct expenses related to the production of the Hogue well while the indirect expenses did not. Appellees correctly divided the expenses into these categories.
{¶ 37} Appellants next claim that Koy Whitacre admitted the Hogue well did not produce in 2013. This argument is based on an interrogatory. Koy Whitacre stated that revenue from the Hogue well did not exceed expenses in 2013. However, *323 in the same interrogatory, Whitacre denied that the well did not produce in paying quantities. While there is a discrepancy in the responses to the interrogatory, exhibits B and C show that the well was profitable in 2013.
{¶ 38} According to exhibit C, Appellees total gross income for 2013 was $1,418.00. As for expenses, the document shows $177.27 for landowner royalties, $10.83 for gas severance taxes, $60 for maintenance, $347.50 for water hauling, and $135.39 for direct operating expenses for a total of $730.99. After deducting these expenses from the gross income, Appellees show a $687.01 profit for the year 2013.
{¶ 39} Appellants also argue that Appellees' investors were not paid in the years 2013, 2014, and 2015. According to Appellants, failure to pay investors is evidence that the well was not profitable. However, the investor agreement is not part of the record on appeal. We cannot determine how and when investors were to be paid pursuant to that agreement. As the record does not provide evidence about payments to investors, Appellants' argument is unsupported.
{¶ 40} As the summary judgment evidence demonstrates a profit for the year 2013, the trial court properly determined that the well produced in paying quantities.
2014 and 2015
{¶ 41} We have previously recognized that a mere temporary cessation in the production of an oil and gas well will not terminate a lease under the habendum clause where the owner of the lease exercises reasonable diligence and good faith in attempting to resume production of the well. RHDK Oil & Gas, L.L.C. v. Dye , 7th Dist. No. 14 HA 0019, 2016-Ohio-4654, 2016 WL 3522555, ¶ 20, citing Wagner v. Smith , 8 Ohio App.3d 90, 92, 456 N.E.2d 523 (5th Dist.1982).
{¶ 42} Appellants urge that the Hogue well failed to produce any oil or gas from January of 2014 to November of 2015. While Appellees assert that the lack of production was caused by construction involving the compression station, Appellants urge that construction did not begin until March of 2015. In fact, Appellants argue that several other wells connected to the compression station produced during this timeframe, as evidenced by Julie Hogue's affidavit.
{¶ 43} In response, Appellees explain that the production issues in 2014 and 2015 were caused by problems with the Dominion compression station and the ensuing construction of Dominion's new compression station. The compression station was replaced due to several problems that were apparently affecting production. As the compression station is owned and operated by Dominion, Appellees urge that these problems were outside of their control. Appellees point out that production returned to normal levels following completion of the new compression station.
{¶ 44} Appellees also argue that Julie Hogue's affidavit does not provide any evidence they acted unreasonably when resuming production following the temporary cessation. Even so, Appellees argue that the affidavit is not competent, as Julie Hogue does not demonstrate that she is qualified to offer evidence of the reasonableness of Appellees' actions.
{¶ 45} A critical factor in determining the reasonableness of the operator's conduct is the length of time the well is out of production. Id. at ¶ 21, citing Wagner, supra , at 93, 456 N.E.2d 523 ; Jath Oil Co. v. Durbin Branch , 1971 OK 127, 490 P.2d 1086 (Okl.1971). Although the length of the cessation is a critical factor, we have previously declined to establish a bright-line rule in regard to cessation *324 period. Dennison Bridge, Inc. v. Resource Energy, L.L.C. , 7th Dist. 14 HA 21, 2015-Ohio-4736, 50 N.E.3d 242. We have acknowledged that no case can be found where an Ohio appellate court deemed a lease forfeited based on less than two years of nonproduction. RHDK at ¶ 22 ; Lang v. Weiss Drilling Co. , 7th Dist. Nos. 15 MO 0005, 15 MO 0006, 2016-Ohio-8213, 70 N.E.3d 625, ¶ 16. In addition to the length of cessation, a court must consider all attendant circumstances. RHDK at ¶ 21, citing Wagner, supra , at 93, 456 N.E.2d 523 ; Barrett v. Dorr , 140 Ind.App. 295, 212 N.E.2d 29 (1966).
{¶ 46} It appears that the low production in 2014, and even to a degree in 2013, was caused by a problem with Dominion's compression station. According to Koy Whitacre's uncontroverted testimony, the oil and gas produced from Appellants' land traveled through a pipeline leading to the compression station, which was owned by Dominion. (5/12/16 Koy L. Whitacre Depo., p. 60.) Whitacre testified that in 2013, he began experiencing problems with the pipeline. According to Whitacre, he made the decision to stop production until the problems were fixed to ensure that production would be consistent. (Id. , p. 55.) He also testified that he ended up building his own compression station on the Hogue property to enable consistent production due to the problems with the Dominion station. (Id. )
{¶ 47} We note that Appellants contest the admissibility of an affidavit from Koy Whitacre which referred to a statement by a Dominion employee regarding the construction of the compression station. Appellants argue that the statement is hearsay. In response, Appellees assert that the employee's statement formed the basis for Whitacre's beliefs at the time he decided to stop production. Hence, Appellees contend that the statement was not offered to prove the truth of the matter asserted, and is not hearsay.
{¶ 48} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). As pointed out by Appellees, Koy Whitacre's statement regarding information he was given by Dominion formed his understanding of the compression station's ability to assist in the production of gas. This statement was not made to prove the truth of the matter asserted and is not hearsay.
{¶ 49} Regardless, Julie Hogue's affidavit tends to support Whitacre's argument that the pipeline was not functioning properly from August of 2014 through October of 2015. In her affidavit, Hogue averred that she received "check stubs for payments made from gas produced" by two wells operated by a different company that were connected to the Dominion compression station during the relevant time period. Attached to the affidavit are records of gas sales and royalty payments from these other wells. It appears from these records that each of the wells produced nominal royalties. This supports Appellees' argument that shutting down production until the completion of Dominion's compression station was reasonable. The October 2014 records show that a check was issued to Julie Hogue for $58.84 for what appears to be royalty payments from six different wells. While the December 2014 check increased to $276.55, January and February's combined check was only for $20.25, and March and April's combined check was only $23.71. The July check was $26.49. The checks did not increase until December of 2015, when Hogue received a check in the amount of $283.54. Based on these figures, Whitacre's decision to delay production until the compression station *325 problem was fixed appears to have been reasonable.
{¶ 50} Importantly, the new Dominion compression station and new Hogue compression station successfully restored normal production levels. This is evident from exhibit C, which shows that the gas production resumed its normal levels. Additionally, after the compression stations were finished, the well produced oil (60.87 barrels) for the first time since 2008. The exhibit shows five months of production along with one month of projected production (totaling two quarters) which resulted in $1,026.49 in profit.
{¶ 51} Based on this record, the lack of production in 2014 and 2015 was a temporary cessation. There is no evidence demonstrating that Appellees' actions in restoring production were unreasonable. Accordingly, Appellants' first and second assignments of error are without merit and are overruled.
Conclusion
{¶ 52} Appellants argue that the trial court erroneously determined that the Hogue well produced in paying quantities for the years 2012 through 2015. The summary judgment evidence demonstrates that the Hogue well produced in paying quantities from 2012 through 2013. The record also shows that the lack of production in 2014 and 2015 was caused by only a temporary cessation. As such, Appellants' arguments are without merit and the judgment of the trial court is affirmed.
DeGenaro, J., concurs.
Robb, P.J., concurs.