[Cite as *Neuhart v. Transatlantic Energy Corp.*, 2018-Ohio-4099.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## NOBLE COUNTY

VELMA J. NEUHART, et al.,

Plaintiffs-Appellants,

v.

TRANSATLANTIC ENERGY CORP., et al.,

Defendants-Appellees.

---

### OPINION AND JUDGMENT ENTRY
### Case No. 17 NO 0449

---

Civil Appeal from the
Court of Common Pleas of Noble County, Ohio
Case No. CVH-215-0064

**BEFORE:**
Cheryl L. Waite, Gene Donofrio, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed in Part. Reversed and Remanded in Part.

---

*Atty. David J. Wigham*
*Atty. Lucas K. Palmer*
*Atty. J. Breton McNab* and
*Atty. Leighann K. Fink*, Roetzel & Andress, LPA, 222 South Main Street, Suite 400, Akron, Ohio 44308, for Plaintiffs-Appellants Velma J. Neuhart, Charles R. Neuhart, Marilyn Neuhart, James Waldie, Mary Lou Waldie, Candie Clark, Robert Clark, Menno A. Byler, Menno M. Byler, Jr., and Christina E. Byler

*Atty. J. Kevin West*, Steptoe & Johnson PLLC, 41 South High Street, Suite 2200, Columbus, Ohio 43215 and
*Atty. Melanie Morgan Norris*, Steptoe & Johnson PLLC, 1233 Main Street, Suite 3000, P.O. Box 751, Wheeling, West Virginia 26003-0751, for Defendant-Appellee Gulfport

Energy Corporation

*Atty. Daniel P. Corcoran*,
*Atty. James S. Huggins*, and
*Atty. Kristopher O. Justice*, Theisen Brock, L.P.A., 424 Second Street, Marietta, Ohio 45750, for Defendants-Appellees, Northwood Energy Corporation, Ralph W. Talmage, Trustee of the Ralph W. Talmage Trust, and David E. Haid, Trustee of the David E. Haid Trust

*Atty. John P. Brody*, Kegler Brown Hill & Ritter, 65 E. State Street, Suite 1800, Columbus, Ohio  43215, for Defendant Transatlantic Energy Corp., Don Quest and Candace Bennett

*Atty. W. Prentice Snow*, Morrow & Erhard Co., L.P.A., 10 W. Locust Street, P.O. Box 487, Newark, Ohio  43055, for Defendant Sabre Energy Corporation.

Dated:  October 5, 2018

**WAITE, J.**

{¶1}    Appellants Velma J. Neuhart, Charles R. Neuhart, Mary Lou Waldie, James Waldie, Candie J. Clark, Menno A. Byler, Marie A. Byler, Menno M. Byler, Jr., and Christina E. Byler appeal two Noble County Common Pleas Court judgment entries. In the first, dated November 15, 2016, the trial court ruled that Appellants' claim regarding undrilled acreage was barred by the statute of limitations and granted summary judgment in favor of Appellees Northwood Energy Corp. ("Northwood"); Gulfport Energy Corp. ("Gulfport"); Ralph W. Talmage, Trustee of the Ralph W. Talmage Trust; and David E. Haid, Trustee of the David E. Haid Trust.  In the second entry, dated June 13, 2017, the trial court ruled that the remaining acreage was producing oil and/or gas and granted summary judgment in favor of Appellees.

{¶2}    Appellants' argument regarding the undrilled acreage has merit.  As such, the trial court's November 15, 2016 judgment entry is reversed and the matter is remanded.  However, Appellants' argument regarding the production of the existing

Case No. 17 NO 0449

wells is without merit. Accordingly, the trial court's June 13, 2017 judgment entry is affirmed.

### Factual and Procedural History

{¶3} This oil and gas action involves two tracts of land in Beaver Township, Noble County: the Neuhart property and the Waldie property. The Neuhart property encompasses 24.71 acres of land, owned in fee simple by Velma J. Neuhart. Based on the complaint, only Velma J. Neuhart owns an interest in the minerals underlying the Neuhart property. (6/22/15 Complaint, pp. 5-7.) Charles R. Neuhart, Mary Lou Waldie, James Waldie, Candie J. Clark, Menno A. Byler, Marie A. Byler, Menno M. Byler, Jr., and Christina E. Byler own an interest in the Waldie Property. The Waldie Property is not at issue in this appeal.

{¶4} In 1991, Appellants and TransAtlantic Energy Corp. ("TransAtlantic") entered into an oil and gas lease. The lease is signed by Neil A. and Velma J. Neuhart and a TransAtlantic representative and is dated June 9, 1991. The lease contains a two-tiered habendum clause setting out both a primary and secondary term. The length of the primary term was two years. The clause provided that the lessee would remain in the lease past the primary term "so much longer thereafter as oil or gas or their constituents are produced or are capable of being produced on the premises in paying quantities, in the judgment of the Lessee." (June 9, 1991 Lease, paragraph 2.)

{¶5} On the same day, TransAtlantic sent Neil and Velma Neuhart an amendment letter agreeing to release any undrilled acreage in the event that three wells were not drilled on the property by the end of the primary term. A TransAtlantic representative and the Neuharts signed the letter. When the primary term ended in

1993, TransAtlantic had drilled two wells on the Neuhart property. On December 30, 1992, TransAtlantic assigned a 2% interest in the Neuhart wells to Sabre. On February 9, 2006, TransAtlantic assigned the leases to Northwood.

{¶6} According to Appellants, they first learned that Transatlantic and Northwood continued to claim an interest in the undrilled acreage in 2011. On October 13, 2011, Velma J. Neuhart filed and recorded an affidavit of nonproduction regarding the wells. Appellants then sent TransAtlantic a notice of abandonment. Appellants also sent TransAtlantic and Northwood a letter stating their belief that TransAtlantic's interest in the undrilled acreage had terminated pursuant to the June 9, 1991 amendment letter. Both TransAtlantic and Northwood responded, claiming they had a continuing interest in the undrilled acreage.

{¶7} On June 22, 2015, Appellants filed a complaint against Appellees, collectively. The complaint also named TransAtlantic, Sabre Energy Corp., Donald R. Quest, and Candace L. Bennett as defendants. The complaint sought declaratory judgment on their claims regarding both the Neuhart and Waldie properties and quiet title to both properties. As earlier discussed, this appeal involves only the Neuhart property. On July 23, 2015, Appellees filed a counterclaim. On December 30, 2015, Appellees Northwood; Ralph W. Talmage, Trustee of the Ralph W. Talmage Trust; and David E. Haid, Trustee of the David E. Haid Trust, filed a partial motion for summary judgment. They argued that the Neuhart wells were producing in paying quantities and that Appellants' claim regarding the undrilled acreage was barred by the statute of limitations. On February 26, 2016, Appellee Gulfport filed its own motion for summary judgment on the same issues. Named defendants TransAtlantic, Sabre, Donald R.

Quest, and Candace L. Bennett failed to file either a brief in support of or in opposition to summary judgment. On March 21, 2016, the trial court entered an order bifurcating the issues.

**{¶8}** On November 15, 2016, the trial court granted summary judgment in favor of Appellees on the issues involving the undrilled acreage. On June 13, 2017, the trial court also granted summary judgment in favor of Appellees on the remaining issue of paying quantities. Appellants appeal both the November 15, 2016 and June 13, 2017 judgment entries.

ASSIGNMENT OF ERROR NO. 1

THE TRIAL COURT ERRED AS A MATTER OF LAW BY FAILING TO DETERMINE THAT TRANSATLANTIC'S LEASE RIGHTS IN THE UNDRILLED ACREAGE EXPIRED AUTOMATICALLY AT THE END OF THE PRIMARY TERM OF THE LEASE BECAUSE TRANSATLANTIC NEVER DRILLED A THIRD WELL.

ASSIGNMENT OF ERROR NO. 2

THE TRIAL COURT ERRED AS A MATTER OF LAW IN DETERMINING THAT *ANY* STATUTE OF LIMITATIONS BARRED THE LANDOWNERS' CLAIMS BECAUSE THESE CLAIMS DID NOT ACCRUE UNTIL 2011, AT THE EARLIEST, WHEN THE LANDOWNERS FIRST HAD REASON TO BELIEVE THAT NORTHWOOD CLAIMED AN ADVERSE INTEREST IN THE UNDRILLED ACREAGE.

**{¶9}** Pursuant to the letter amendment to the parties' contract, Appellants argue that the undrilled acreage automatically reverted to them at the end of the primary

term because Appellees failed to drill three wells. Appellants contend that no action was required on their part due to the automatic reversion, thus, there is no statute of limitations issue in this matter. In the event that this case involves an issue where a statute of limitations applies, Appellants argue that it should be twenty-one years in accordance with *Rudolph v. Viking International Resources, Co.*, 2017-Ohio-7369, 84 N.E.3d 1066 (4th Dist.).

{¶10} In response, Appellees maintain that the statute of limitations in cases involving oil and gas leases is controlled by R.C. 2305.041. Appellee Northwood argues that the statute of limitations is fifteen years. Acknowledging that uncodified law exists that interprets an amendment to R.C. 2305.041, Appellee TransAtlantic argues that the statute of limitations is eight years. Regardless which statute of limitations is applied, both Appellees contend that Appellants' claim is barred because the triggering event in this matter occurred in 1993, twenty-two years before their complaint was filed.

{¶11} The determinative issue here is whether the letter amendment to the parties' contract amounts to a Pugh clause. Generally, leased lands are considered indivisible. *Summitcrest, Inc. v. Eric Petroleum Corp.*, 2016-Ohio-888, 60 N.E.3d 807 (7th Dist.). A Pugh clause in a lease allows land to become divisible when the lease is held by production of less than the whole acreage. *Id.* The Pugh clause allows the lease to continue only as to the producing acreage. *Id.* Hence, if the language of the letter amending the parties' contract is construed to be a Pugh clause, the undrilled acreage automatically reverted to Appellants. No further action on their part would have been required and no statute of limitations would apply.

**{¶12}** The original lease was signed by the parties on June 9, 1991. On that same day, the parties signed the amendment letter. The letter states in full:

Please be advised that TransAtlantic Energy Corp. has agreed to Lease your property with the following stipulations;

TransAtlantic Energy Corp. does hereby agree, at the expiration of the primary term of the lease, to release the balance of the undrilled acreage covered by that certain Oil & Gas Lease dated June 9, 1991, and being recorded in Volume 110, Page 676 of the Noble County Lease Records, in the event that (3) three Wells are not drilled on the above referenced Lease within the primary term of (2) Two Years. However, It [sic] is futher [sic] agreed that TransAtlantic Energy Corp. shall hold the acreage that is required to comprise the Well unit as set out by the ODNR Division of Oil & Gas for the depth to which the Well has been drilled.

This letter shall be made a part of the aforementioned Lease by this reference and shall be deemed binding to both parties of said Lease as long as the terms and conditions of the lease have been complied with.

[sic]

(6/9/91 Amendment Letter.)

**{¶13}** It is apparent from the facts of this case that the letter integrated a term into the lease the parties had intended to include, but for some unknown reason this term was omitted from the underlying lease. The amendment by letter incorporated its language into the original lease and made this language a lease term.

Case No. 17 NO 0449

{¶14} Appellees contend that the contents of the amendment letter merely created a drilling covenant rather than a term covenant. The plain language of the letter, however, specifically provides for the release of undrilled acreage at the end of the primary term. This language evinces that the parties certainly intended to terminate the lease as to any undrilled acreage at the end of the primary term. Hence, the language addresses the term of the lease rather than merely addressing the manner or method of drilling. If the parties had intended to create a drilling covenant, language regarding the release of undrilled land would have been excluded as unnecessary.

{¶15} It is a general principle of law that "a contract is to be construed against the party who drew it." *Poirier v. Chong Hui Sin*, 7th Dist. No. 97 C.A. 158, 1999 WL 35306, *6 (Jan. 14, 1999), citing *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313-314, 667 N.E.2d 949 (1996). Appellees drafted both the original lease and the letter amending the lease. Any ambiguity is therefore construed against Appellees.

{¶16} Appellees urge that, even if the amendment letter constitutes a Pugh clause, it was not recorded. However, Appellants are blameless for the failure to record the amendment letter. Again, Appellees drafted both the original lease and the amendment letter. Appellees recorded the original lease, which was signed the same date as the amendment letter. Appellees have not explained why they failed to record the letter of amendment. Northwood points out that their predecessor, TransAtlantic, was in possession of the lease file at the time the documents were drafted and the original lease was recorded, and urge that they should not be held to account for TransAtlantic's failure to record the amendment. However, when Northwood purchased

Case No. 17 NO 0449

the lease file, Northwood stepped into TransAtlantic's place. Northwood has no greater rights or fewer duties than TransAtlantic possessed.

{¶17} Although the trial court determined that to regain the rights to their property Appellants were required to take some further action, and so construed this matter as a statute of limitation problem, because the amendment letter sets out a Pugh clause the undrilled acreage automatically reverted to Appellants by operation of law. Appellants were not required to take any action in order to obtain their right to the undrilled acreage once the primary term ended in 1993. Appellees rely on *Potts v. Unglaciated Industries,* 7th Dist. No. 15 MO 0003, 2016-Ohio-8559 and *Ricketts v. Everflow Eastern, Inc.,* 2016-Ohio-4807, 68 N.E.3d 165 (7th Dist.) to contend Appellants waited too long to assert their rights. However, neither *Ricketts* nor *Potts* involved a Pugh clause. This clause governs the rights and duties of the parties regarding the undrilled property. The right to control the undrilled property automatically reverted to Appellants at the end of the primary term by operation of this clause and discussion of any statute of limitations is irrelevant.

{¶18} Accordingly, Appellants' first and second assignments of error have merit and are sustained. However, our determination regarding the automatic reversion of rights in the undrilled acreage to Appellants does not fully resolve this issue. In Appellants' complaint they sought the remedy of specific performance or monetary damages for Appellees' continued use of the property. Because the trial court ruled that the statute of limitations barred Appellants' claim, any harm suffered by them and the issue of remedy was never addressed. Thus, this issue is remanded to the trial court in order to address Appellants' outstanding claims.

## ASSIGNMENT OF ERROR NO. 3

THE TRIAL COURT ERRED IN DENYING THE LANDOWNERS' SUMMARY JUDGMENT MOTION AND GRANTING APPELLEES' SUMMARY JUDGMENT MOTIONS AS WHETHER THE NEUHART NO. 1 WELL PRODUCED OIL OR GAS IN PAYING QUANTITIES.

## ASSIGNMENT OF ERROR NO. 4

THE TRIAL COURT ERRED IN DETERMINING THAT NO GENUINE ISSUES OF MATERIAL FACT REMAINED AS TO WHETHER THE NEUHART NO. 2 WELL PRODUCED OIL AND GAS IN PAYING QUANTITIES.

{¶19} Appellants also contend that the lease has terminated as to the property containing the two existing wells, Neuhart Well No. 1 and Neuhart Well No. 2, due to the wells' lack of production in paying quantities. Appellants focus on production during the years 2013 through 2016. However, they argue that even if this Court looks to the period relied on by Appellees, 2010 through 2016, the lease has expired due to lack of production in paying quantities.

{¶20} We note that Appellants filed their complaint in May of 2015 and the expense records pertaining to these wells are not part of the appellate record. Thus, we cannot complete an analysis regarding paying quantities for the months of June through December of 2015 or for the year 2016. For ease of understanding, then, Appellants' third and fourth assignments of error will be addressed together.

*Applicable Law*

Case No. 17 NO 0449

**{¶21}** The Ohio Supreme Court has defined the term "paying quantities" as the production of "quantities of oil or gas sufficient to yield a profit, even small, to the lessee over operating expenses, even though the drilling costs, or equipping costs, are not recovered, and even though the undertaking as a whole may thus result in a loss." *Blausey v. Stein*, 61 Ohio St.2d 264, 265-266, 400 N.E.2d 408 (1980).

**{¶22}** A lessee is given discretion to determine whether a well is profitable, however, a good faith standard is imposed on the lessee. *Burkhart Family Trust v. Antero Resources Corp.*, 7th Dist. Nos. 14 MO 0019, 14 MO 0020, 2016-Ohio-4817, 68 N.E.3d 142, ¶ 18, citing *Hupp v. Beck*, 7th Dist. Nos. 12 MO 0006, 13 MO 0002, 13 MO 0003, 13 MO 0011, 2014-Ohio-4255, 20 N.E.3d 732. A plaintiff bears the burden of proving that a well is not producing in paying quantities. *Burkhart, supra*, at ¶ 13, citing *Moore v. Adams*, 5th Dist. No. 2007AP090066, 2008-Ohio-5953.

*Neuhart Well No. 1*

**{¶23}** Appellants argue that in their calculations Appellees have misrepresented their expenses by omitting a monthly $175 administrative fee and maintenance and repair costs. According to Appellants, this well suffered a loss of $7,696.27 from 2013 to 2016. If the time period is extended to include 2010 through 2016, Appellants assert that Appellees lost $7,597.69. If the administrative fees are added to the paying quantities analysis, the well caused Appellees to lose $16,096.27 between 2013 and 2016. When the time period is extended to include 2010 through 2012, that number rises to $18,457.69. Appellants also argue that gathering and compression fees were not considered in making the paying quantities analysis.

**{¶24}** In response, Appellees argue that any analysis of paying quantities should consider 2010 through 2016 as the base period rather than basing an examination of production separately, year-to-year. Regardless, Appellees contend that the numbers Appellants cite from the expense report do not provide an accurate representation of the well's expenses. According to Appellees, the report does not differentiate between the types of expenses, including: operating expenses, capital expenses, administrative charges, and gathering and compression fees. According to Appellees, only the operating expenses should be included in an analysis of paying quantities.

**{¶25}** Additionally, Appellees point out that Appellants concede they have attempted to terminate the lease since 2011. Because of Appellants' efforts in this regard, Appellees urge that they were unable to make significant expenditures, because they would not recoup those costs in the event the lease was terminated. Appellees cite to caselaw from other states holding that a lessor's obligations are suspended during the time that a landowner asserts forfeiture claims. Even if we were to adopt these cases, however, the record reveals that months after the complaint in this matter was filed, Appellees invested $5,000 in the property to replace a broken pump. As Appellees were apparently willing to invest relatively large amounts of money in this well even after the complaint was filed, there is no evidence in this record suggesting that Appellees were unable to make expenditures due to any uncertainty regarding their right to the leasehold.

**{¶26}** It is unclear from the trial court's entry whether it analyzed the well's production on a year-to-year basis or using as a base period the years 2010 through 2016. Beginning with 2010, Appellees' records show that the well produced 532 MCF

of gas, generating $3,933.66 in revenue. No oil was sold during this year, but there is evidence that oil was collecting in the tank. According to certain records, Appellees incurred $4,323.42 in expenses during 2010. However, Holly Clemens testified in her deposition that this amount includes operating expenses, capital expenses, and compression and gathering fees. (3/31/17 Clemens Depo., pp. 36-37.) According to Clemens, only the operating expenses are directly related to the production of oil and gas.

**{¶27}** Appellees do not dispute that the following operating expenses are relevant in a paying quantities analysis: $22.73 for tax purposes, $7.58 to Noble County for property tax purposes, $1,200 for the cost of pumping the wells, $64.50 for chart integration fees, $40.85 to Sweeney Services (routine maintenance work), $80 for brine removal, and $532.34 for royalties. These total $1,948.

**{¶28}** Appellants argue that a monthly $175 administration fee should be included as an operating expense. Clemens testified that this is a service fee charged to the working owners and is paid to Northwood. According to Clemens, the fee covers only the costs of recordkeeping services, accounting services, and the disbursement of royalties. (3/31/17 Clemens Depo., p. 30.) It is calculated on the individual owner's percentage of ownership. For example, if an investor owns one-half percent of a working interest, that owner would be charged one-half percent, times the total administrative fee amount ($175), which in this example totals eighty-eight cents (.50 X $175 = 88). This amount is then paid to Northwood. (3/31/17 Clemens Depo., p. 33.)

**{¶29}** The issue of whether monthly payments are operating expenses for purposes of a paying quantities analysis depends on whether the fee is directly related

to the production of oil and gas. In *Hogue v. Whitacre*, 2017-Ohio-9377, -- N.E.3d -- (7th Dist.), appeal not allowed *Hogue v. Whitacre*, 152 Ohio St.3d 1480, 2018-Ohio-1990, we considered whether monthly administrative fees paid by an oil and gas company to a third-party entity constituted an expense in a paying quantities analysis. We determined that these fees were not directly related to the production of oil and gas, and were not to be included. We based our decision on evidence showing that the monthly payments did not contribute to the production of oil and gas. However, in *Kraynak v. Whitacre*, 7th Dist. No. 17 MO 0014, 2018-Ohio-2784, we held that a monthly payment from an oil and gas company to a third-party entity was a direct operating cost. We relied on testimony from the oil and gas company president that the monthly payments did represent a cost of operating the well. *Id.* at ¶ 30.

**{¶30}** The record in this case contains evidence that the administrative fee in question did not contribute to the production of oil and gas. Instead, the evidence shows that the payments covered overhead costs. As such, the administrative fee should not be deducted as an expense in any paying quantities analysis in this matter.

**{¶31}** Appellants next argue that gathering and compression fees should be included in a paying quantities analysis, here. The Sixth Circuit has defined gathering as "the movement of lease production to a central accumulation and/or treatment point on the lease, unit or communitized area, or to a central accumulation or treatment point off the lease, unit or communitized area." *Poplar Creek Dev. Co. v. Chesapeake Appalachia L.L.C.*, 636 F.3d 235, fn. 1 (6th Cir.2011). The Court defined compression as " 'the process of raising the pressure of gas.' It is often used to transport low pressure gas through the pipeline to a place where it can be sold." *Id.* at fn. 2. Both

gathering and compression are considered post-production processes as they occur after the gas leaves the well. *Id.* at 239.

**{¶32}** Gathering and compression costs are not directly related to the production of oil and gas. In fact, they become relevant only after oil and gas is produced. Importantly, Appellees in this case own the pipeline. (3/31/17 Clemens Depo., p. 52.) Even if the gathering and compression process were somehow related to the production of oil and gas, these fees are not expenses. Instead, the fees represent merely an accounting mechanism, as Appellees essentially pay themselves for use of their own pipeline. (3/31/17 Clemens Depo., p. 66.) Hence, the gathering and compression fees are not expenses for purposes of a paying quantities analysis in this matter.

**{¶33}** Accordingly, this record shows that Appellees' expenses for 2010 amounted to $1,948. Appellees generated $3,933.66 in revenue. Simple subtraction reveals they received a profit of $1,985.66 for that year.

**{¶34}** In 2011, the well produced 575.54 MCF of gas for a total revenue of $4,139.09. Appellees do not dispute the following expenses are included in a paying quantities analysis for 2011: $47.94 for income tax purposes, $30.36 in Noble County property tax, $1,200 for the cost of pumping the well, $117.80 for chart integration fees, and $556.99 for royalties. These expenses total $1,953.09.

**{¶35}** As administrative fee and gathering and compression fees are not to be included, the above represent the sole expenses in a paying quantities analysis. Again, Appellees generated $4,139.09 in revenue and had $1,953.09 in expenses. They received a profit of $2,186 for 2011.

Case No. 17 NO 0449

{¶36} In 2012, the well produced 382 MCF of gas for a total revenue of $2,268.82. Appellees concede the following expenses: $13.54 to Noble County for property taxes, $19.89 income tax, $1,200 in pumping costs, $117 for chart integration fees, and $288.14 for royalties. These total $1,638.57 and Appellees received a profit of $630.25.

{¶37} In 2013, the well produced 299 MCF of gas, generating $1,901.36 in revenue. The following expenses are included: $13.10 in Noble County property taxes, $9.02 for income tax, $1,300 for pumping the well, $117 for chart integration fees, and $247.23 for royalties. These total $1,686.35, so that Appellees had a profit of $215.01.

{¶38} In 2014, the well produced 155 MCF of gas, generating $1,017.50 in revenue. Appellees agree to the following expenses: $7.34 for property taxes, $4.70 for income tax, $1,200 for pumping, $136.50 chart integration fees, and $102.25 for royalties. These expenses total $1,450.79. Based on these totals, Appellees lost $433.29 in 2014.

{¶39} Through the date of filing of the complaint in May of 2015, the well produced 56.26 MCF of gas and generated $480.19 in revenue. The direct operating costs for this period of time include: $4.46 property taxes, $48.75 chart integration fee, $500 pumping fee, $1.73 income taxes, and $15.68 for royalty payments. As the total expenses amount to $570.62, Appellees lost $90.43 through May of 2015.

{¶40} Although the expense records from June through December of 2015 are not part of the appellate record, it is important to consider the production records during this timeframe as they explain the dip in production in 2014 and in the first half of 2015. According to Appellees, a broken pump was responsible for low production during this

period. The production report shows that from the time of replacement of the pump in August, the well produced 189.12 MCF through December of 2015, almost twice the production from January to July (108 MCF). The evidence reflects that low production was likely caused by the broken pump.

**{¶41}** Thus, we must determine whether the low production in 2014 and in the first half of 2015 was a temporary or permanent cessation. "It is in the very nature of an oil and gas well for production interruptions to occur ranging from temporary to permanent." *Paulus v. Beck Energy Corp.*, 2017-Ohio-5716, 94 N.E.3d 73, ¶ 75 (7th Dist.), citing *Dennison Bridge, Inc. v. Resource Energy, L.L.C.*, 2015-Ohio-4736, 50 N.E.3d 242, at ¶ 24. The Fourth District has provided the general rule regarding temporary cessation in *Wagner v. Smith*, 8 Ohio App.3d 90, 92, 456 N.E.2d 523 (4th Dist.1982). *Wagner* determined: "Courts universally recognize the proposition that a mere temporary cessation in the production of a gas or oil well will not terminate the lease under a habendum clause of an oil and gas lease where the owner of the lease exercises reasonable diligence and good faith in attempting to resume production of the well." *Id.*

**{¶42}** "[A] critical factor in determining the reasonableness of the operator's conduct is the length of time the well is out of production." *RHDK Oil & Gas, L.L.C. v. Dye*, 7th Dist. No. 2016-Ohio-4654, ¶ 21, citing *Wagner* at 93, 456 N.E.2d 523; *Jath Oil Co. v. Durbin Branch*, 490 P.2d 1086 (Okl.1971). Additionally, a court must consider all attendant circumstances. *RHDK* at ¶ 21, citing *Wager* at 93; *Barrett v. Dorr*, 140 Ind.App. 295, 212 N.E.2d 29 (1966).

**{¶43}** Here, the cessation lasted from early 2014 until August of 2015. While we have declined to establish a bright-line rule, we have acknowledged that "other appellate districts have held that a lease expires when there is no oil or gas produced for two years or more." *Lang v. Weiss Drilling Co.*, 2016-Ohio-8213, 70 N.E.3d 625, ¶ 16 (7th Dist.), citing *Schultheiss v. Heinrich Ents. Inc.*, 2016-Ohio-121, 57 N.E.3d 361, ¶ 19 (4th Dist.), reconsideration granted in part (Mar. 11, 2016), appeal not allowed, 146 Ohio St.3d 1431, 2016-Ohio-4606, 52 N.E.3d 1205, ¶ 19, reconsideration granted, 146 Ohio St.3d 1494, 2016-Ohio-5585, 57 N.E.3d 1172, and appeal allowed, 146 Ohio St.3d 1494, 2016-Ohio-5585, 57 N.E.3d 1172; *Wagner*, *supra*, at 94.

**{¶44}** The record does not specify when Appellees learned the well had a broken pump. Northwood President William Arnholt testified that the company that pumps the well would have alerted them to the issue and then Northwood would have arranged for necessary repairs. (Arnholt Depo., pp. 112-113.) The record is devoid of any evidence that Appellees failed to take reasonable action to resume production after learning that the pump was broken. The record shows that the pump was replaced in August of 2015 and that production resumed to normal levels immediately.

**{¶45}** Appellants argue that the costs of replacing the pump should be considered an expense for purposes of a paying quantities analysis. However, we have held that a pump replacement "can be considered a non-recurring, capital investment to be excluded from operating expenses as an equipping cost." *Paulus, supra,* at ¶ 61. Thus, these expenses are not considered in a paying quantities analysis. Even so, the repair occurred in August. The expense records from June through December of 2015 are not a part of the appellate record.

Case No. 17 NO 0449

**{¶46}** Appellants claim that additional maintenance and repair expenses must be calculated in a paying quantities analysis. However, the only expenses Appellants raise are the previously discussed pump replacement. While they also make a vague reference to repairs that were included in a deposition exhibit, these were not made part of the appellate record.

**{¶47}** Appellants also contend that William Arnholt, President of Northwood, admitted in his deposition that the well did not produce in paying quantities. Civ.R. 30(B)(5) provides:

> A party, in the party's notice, may name as the deponent a public or private corporation, a partnership, or an association and designate with reasonable particularity the matters on which examination is requested. The organization so named shall choose one or more of its proper employees, officers, agents, or other persons duly authorized to testify on its behalf. The persons so designated shall testify as to matters known or available to the organization. Division (B)(5) does not preclude taking a deposition by any other procedure authorized in these rules.

**{¶48}** Appellees designated that Holly Clemens was to testify regarding any matter dealing with the calculation of profitability, not Arnholt. Regardless, the alleged admission occurred when Appellants asked Arnholt if the well was producing in paying quantities. Arnholt initially said it was, but Appellants' counsel asked him if the well was producing in paying quantities once Appellants' calculations were considered. It was to this question that Arnholt responded, "no." We can readily determine that Arnholt

believed the well was profitable unless the administrative fee and compression and gathering fees were (improperly) included in a paying quantities analysis.

**{¶49}** Appellants also contend that an internal email between Arnholt and a Gulfport representative indicated that the well was not producing in paying quantities. While Appellants are correct about this email, it was sent before the broken pump was repaired. Again, production greatly increased after the broken pump was replaced.

**{¶50}** As to the base period used in the paying quantities analysis, we recognize that the base period "can be influenced by various considerations, requiring an assessment of the totality of the circumstances and the good faith of the lessee." *Paulus, supra,* at ¶ 78. We also recognize that "[t]he trial court was the fact-finder whose job was to determine the reasonableness of the base period to be used." *Id.* at ¶ 85.

**{¶51}** It is unclear from the trial court's judgment entry in this matter which base period was used, but all of the evidence shows that the well produced in paying quantities during the relevant time period no matter how the period was set. Appellants made a profit in the years 2010, 2011, 2012, and 2013. Although production declined in 2013 and Appellants lost money in 2014 and from January through May of 2015, it is apparent that production resumed for the remaining months of 2015, and that the losses were as a result of a temporary cessation caused by a broken pump.

**{¶52}** Accordingly, Appellants' third assignment of error is without merit and is overruled.

*Neuhart Well No. 2*

Case No. 17 NO 0449

{¶53} Appellants contend that Neuhart Well No. 2 also failed to produce in paying quantities. Appellants repeat their arguments concerning administrative fee and repair expenses. Although Appellants' complaint alleged a lack of production from 2010 through 2015, on appeal they limit this period to 2014 through 2016. Again, the complaint was filed in May of 2015 and the record contains expense reports only through that date. Thus, we lack sufficient evidence to review June through December of 2015 and any portion of 2016.

{¶54} In 2014, Neuhart Well No. 2 produced 508 MCF of gas for a total revenue of $2,299.88. Appellees agree that the following are included as operating expenses: $126.75 for chart integration, $1,200 for pumping, $14.36 to Noble County for real estate taxes, $15.36 for income taxes, and $194.34 for royalty payments. These expenses total $1,550.81 and Appellees made a profit of $749.07 for the year 2014.

{¶55} In 2015, the well produced a total of 547.88 MCF for a total revenue of $2,427.64. From January through May of 2015, the well produced 130.16 MCF for a total revenue of $473.73. Appellees agree to the following operating expenses: $68.25 for chart integration, $500 for pumping, $14.18 for Noble County real estate taxes, $3.94 for income taxes, and $31.10 for royalty payments. These expenses total $617.47 and Appellees lost $143.74 from January to May of 2015.

{¶56} While the well operated at a loss for the first five months of 2015, the evidence shows the well went on to produce 417.72 MCF in the remaining months (June through December) of 2015. "[T]he caselaw indicates that absent a finding of unreasonableness, a six-month cessation period is temporary and does not terminate a

lease." *RHDK* at ¶ 24; *Lang* at ¶ 16. The record is devoid of any evidence to suggest that the five month loss period was unreasonable.

**{¶57}** Although we are without sufficient evidence to complete an analysis of paying quantities for the remainder of 2015, production admittedly resumed to normal levels after a temporary cessation. Hence, the record contains evidence that the well produced in paying quantities. Appellants' fourth assignment of error is without merit and is overruled.

### Conclusion

**{¶58}** Appellants are correct that the trial court erred in holding that any statute of limitations barred their claim regarding the undrilled acreage. The right to control this property automatically reverted to Appellants. The trial court's November 15, 2016 judgment entry granting Appellees summary judgment is reversed. Because Appellants were prevented from arguing damages, the matter is remanded for further proceedings. Appellants also argue that Neuhart Well No. 1 and Neuhart Well No. 2 have failed to produce in paying quantities. However, the record demonstrates that both wells produced in paying quantities during the relevant timeframe. The trial court's June 13, 2017 judgment entry is affirmed.

Donofrio, J., concurs.

Robb, P.J., concurs.

---

For the reasons stated in the Opinion rendered herein, Appellants' first and second assignments of error are sustained and their third and fourth assignments are overruled. It is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Noble County, Ohio, is affirmed in part and reversed in part. We hereby remand this matter to the trial court for further proceedings according to law and consistent with this Court's Opinion. Costs to be taxed against Appellees.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**