[Cite as *Talbott v. Condevco, Inc.*, 2020-Ohio-3130.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MONROE COUNTY

PHYLLIS H. TALBOTT SUBSTITUTED BY LINDA CHRISTMAN,
EXECUTOR OF THE ESTATE OF PHYLLIS H. TALBOTT,

Plaintiff-Appellant,

v.

CONDEVCO, INC. et al.,

Defendants-Appellees.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 19 MO 0007**

---

Civil Appeal from the
Court of Court of Common Pleas of Monroe County, Ohio
Case No. 2016-132

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, David A. D'Apolito, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. David Wigham, Atty. Leighann Fink,* Roetzel & Andress, LPA, 222 South Main Street, Suite 400, Akron, Ohio for Plaintiff-Appellant and

*Atty. Daniel P. Corcoran, Atty. Kristopher O. Justice, Atty. Adam J. Schwendeman,* Theisen Brook, 424 Second Street, Marietta, Ohio 45750, for Defendants-Appellees

Dated:  May 4, 2020

_____

**Robb, J.**

{¶1}    The decision of the Monroe County Common Pleas Court granting summary judgment in favor of Defendant-Appellee Condevco Inc. (et al.) was appealed by Plaintiff-Appellant Phyllis Talbott.  Appellant contends Condevco did not properly exercise its option to adopt the orphan well on her property under the terms of the oil and gas lease because, although Condevco reworked an abandoned well, it did not register the well and the related entity who did register the well did not do so until after the primary term expired.  This argument lacks merit.

{¶2}    Appellant alternatively argues the well failed to produce in paying quantities. We find the trial court properly stopped the base period for evaluating production when the lawsuit was filed.  Regarding which operating expenses to subtract from the revenue, we agree with the decision to exclude the initial swabbing events that were part of evaluating and reopening the abandoned well.  As for subsequent production by swabbing, a rental rate for the swab rig need not be imputed where no rental was charged by an affiliated company.  Although the trial court should have included the labor rate earned by Condevco's employees as an operating expense, the well still showed a profit. In accordance, the lease was maintained by production in paying quantities.  The trial court's judgment is affirmed.

## STATEMENT OF THE CASE

{¶3}    On July 2, 2009, Phyllis Talbott executed an oil and gas lease, dated June 20, 2009, which provided Condevco Inc. drilling and production rights over her 81 acres of land in Monroe County.  (Recorded 12/29/11, Vol. 212, P. 185).  The term of the lease was three years and thereafter as long as oil or gas is produced (from this land or pooled land) or drilling operations are continually prosecuted.[1]  Noting the existence of orphan wells on the leasehold, the lease provided Condevco "the option to evaluate existing wells and utilize these wells at its discretion and, if Lessee decided to 'adopt' an orphan well

_____

[1] The clause also said the lease would be maintained if the land was used for gas storage or substance injection, but the "Additional Terms" thereafter stated the premises will not be used for storage or injection (except to enhance recovery).

and return it to production, any royalty income will be considered to have the same effect as a newly drilled well for purposes of this Lease."

{¶4} Delay rentals of $5 per acre were paid each year during the primary term. Before the end of the primary term, Condevco reworked one orphan well, which is the well at issue in this case (called the Talbott Well by Appellees but officially called the Van Schwaben Well 3, API number 341116 0202 0000).

{¶5} According to the deposition testimony of its vice-president, Condevco evaluated the well through "trial and error" to ascertain that the well would be operated as a swabbing well, instead of a pumping well. He said the process of swabbing involves the use of a swab rig to lower a tool carrying rubber cups into the hole; as the cups are pulled up through the fluid in the hole, the fluid is dragged to the surface where the oil separates from the brine. A cycle was explained: drawing fluid from the well can result in oil collection; it can also free any gas which is clogged by the fluid; and then, as gas is produced, a return of fluid may bring oil but slow the gas. (B. Chavez Depo. 281).

{¶6} On May 7, 9, and 10, 2012, Condevco pulled the old rods and pump from the well bore, replaced them, and attempted to pump the well. On May 14 and 15, the rods were pulled again, and the well was swabbed. On the last three days of May, Condevco used a bailer to clean sand and debris from the bottom of the hole (after pulling the tubing from the well). On June 4, Condevco replaced the tubing.

{¶7} Thereafter, the well was swabbed nine days in June 2012, all before the end of the primary term. These swabbing events produced a total of 83.64 barrels of fluid which contained 15.4 barrels of oil. This oil was sold for $1,335.80. Condevco paid the corresponding 12.5% royalty to Talbott in August 2012.

{¶8} In 2013, the well was swabbed twice (one day in April and one day in June), resulting in the collection of 32 barrels of fluid containing 15 barrels of oil (almost 47% of the fluid was oil, compared to the June 2012 swabbing where only 18% of the fluid was oil). Condevco's vice-president explained that the increased percentage of oil in the fluid was expected as the well was shut for years, and he noted the 2012 swabbing helped flush out the production. (B. Chavez Depo. 280).

{¶9} In 2014, the well was swabbed once in June, producing 15.58 barrels of fluid. A gas line was installed in November 2014, connecting the well to the main line 1,600 feet away where a compressor was used to assist in gas production. Condevco

reported gas production of 25 mcf in the last two months of 2014 and 312 mcf in 2015. The compressor was down for two months in 2015, and no gas was attributed to those months. The meter was replaced more than once in the first year due to issues with pressure. In 2015, Condevco swabbed the well two days in a row in August and two days in a row in December, producing 28 barrels of fluid. Combined with the fluid collected in 2014, 18.47 barrels of oil were produced.

{¶10} On January 11, 2016, Phyllis Talbott filed suit against Condevco, alleging the lease terminated for lack of production and setting forth claims for declaratory judgment, quiet title, trespass, ejectment with a request for a permanent injunction, and conversion with a request for an accounting. The following defendants were named as they were partially assigned various lease rights: Deep Rock Investments LLC; Flat Rock Development LLC; Flat Rock Orion LLC; Hartz Buckeye Energy LLC; and Hartz Energy Capital LLC. The second amended complaint (filed on July 9, 2018) added Heinrich Enterprises Inc. as a defendant because this company was registered as the owner of the well in the records of the Ohio Department of Natural Resources (ODNR). A counterclaim sought a declaration that the lease was in full force due to the orphan well's production (and alternatively claimed the landowner was unjustly enriched and sought the cost of improvements and any plugging cost).

{¶11} Both sides filed motions for summary judgment. The plaintiff alleged: returning an orphan well to production was only one step; the well was not adopted by Condevco as they did not file a Form 7 with ODNR to transfer ownership of the orphan well; this act was performed only by Heinrich Enterprises but that company was not listed as the owner by ODNR until four years after the primary term expired; and the well did not produce in paying quantities due to the operating expenses exceeding the revenue. As to operating expenses, the plaintiff's arguments included: the June 2012 swabbing was an operating expense rather than a capital expense; a fair swab rig rental rate should be imputed; and labor costs should not be ignored merely because the company has employees who perform the work. An expert's affidavit and report was filed in support; he valued certain items as operating expenses and opined the production was not in paying quantities.

{¶12} The defense argued: the well was adopted when Condevco reworked and produced from it; the lease did not require a form to be filed; Heinrich Enterprises was an

affiliated company with the same owners and was the regulatory bondholder for all Condevco wells under an internal agreement; and the duty to register a well can be delegated and is not personal. It was noted that an affidavit to transfer ownership of the orphan well was filed in 2013, but they did not realize they misidentified the well number until speaking with ODNR in 2016, when ODNR registered Heinrich Enterprises as the owner in its records.

{¶13} On paying quantities, the defense said: the swab rig was not an operating expense as there was no direct expenditure for it since it was owned by Heinrich Enterprises; assuming it was an operating expense, the imputed rental rate was too high; the labor of their own employees was not an operating expense; and the production data after the suit was filed should not be included in the calculation as they had no incentive to stimulate production or drill a new well considering the allegations in the lawsuit. They urged deference to the lessee's good faith judgment, noting the substantial capital investment which Condevco had the right to recoup through profit over time.

{¶14} On January 14, 2019, the trial court granted summary judgment in favor of the defense. The court found the unambiguous lease language granted the right to adopt an orphan well by returning it to production, thereby maintaining the lease. The court noted the testimony of the plaintiff's expert admitting that once Condevco worked on the well, ODNR would hold it responsible for plugging the well regardless of whether Form 7 was on file. The court held the cost of swabbing in June 2012 was a one-time capital expense rather than an operating expense. The court also found the use of the company's own employees and swab rig did not result in a direct expenditure to categorize as an operating expense; the court also noted the plaintiff's expert used a labor cost that was not what employees were paid and a rig rental rate that was not relevant.

{¶15} The trial court concluded Condevco restored an orphan well to production before the expiration of the primary term and the well has continuously produced in paying quantities. The plaintiff (hereinafter Appellant) filed a timely notice of appeal. The appeal was held in abeyance on suggestion of Appellant's death, and the executor of her estate, Linda Christman, was thereafter substituted as the appellant.

STANDARD OF REVIEW

{¶16} We review the granting of summary judgment under a de novo standard of review. *Comer v. Risko*, 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, ¶ 8. We

therefore apply the same standard as the trial court to ascertain if summary judgment was warranted. Pursuant to Civ.R. 56(C), summary judgment shall be granted when the evidence shows there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Summary judgment is appropriate if reasonable minds can only find in favor of movant after considering the evidence in the light most favorable to the non-movant. Civ.R. 56(C).

{¶17} A summary judgment movant has the initial burden of stating why the movant is entitled to judgment as a matter of law and showing there is no genuine issue of material fact. *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, ¶ 10, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292-294, 662 N.E.2d 264 (1996). The non-movant then has a reciprocal burden. *Id.* The non-movant's response, by affidavit or as otherwise provided in Civ.R. 56, must set forth specific facts showing there is a genuine issue of material fact for trial and may not rest upon mere allegations or denials in the pleadings. Civ.R. 56(E).

{¶18} The material issues in a given case depend on the applicable substantive law. *Byrd*, 110 Ohio St.3d 24 at ¶ 12. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* As such, if a genuine issue of fact is alleged on several minor items that together would not be dispositive in a calculation, a summary judgment would not need to be reversed and those items would not need to be addressed on their merits.

<u>ADOPTION OF THE ORPHAN WELL</u>

{¶19} Appellant's sole assignment of error lists three issues; two on adoption of an orphan well and one on paying quantities. Appellant initially contends:

"THE TRIAL COURT ERRED AS MATTER OF LAW IN GRANTING SUMMARY JUDGMENT TO APPELLEES, INSTEAD OF TO APPELLANT, BECAUSE NO GENUINE ISSUES OF MATERIAL FACT REMAIN AS TO WHETHER: (1) CONDEVCO EVER ADOPTED THE VAN SCHWABEN WELL UNDER THE TERMS OF THE LEASE; [or] (2) HEINRICH ENTERPRISES ADOPTED THE VAN SCHAWBEN WELL ON JUNE 9, 2016, ALMOST FOUR (4) YEARS AFTER THE PRIMARY TERM OF THE LEASE EXPIRED * * *."

{¶20} Appellant argues the only party who adopted the well was Heinrich Enterprises, when it was registered as the owner in ODNR records. Appellant

emphasizes: the lease names Condevco as the lessee; the lease allows the lessee to adopt an orphan well; there was no evidence that Condevco assigned its rights as the lessee to Heinrich Enterprises; and in any event, Heinrich Enterprises was not listed as the owner of this well in ODNR records until June 9, 2016, nearly 4 years after the primary term expired. Appellant states that in order to hold the lease, Condevco had to engage in two steps before the end of the primary term: adopt the orphan well through the ODNR registration process and return it to production. It is urged that Condevco's production is irrelevant if the well was never adopted by Condevco and Condevco was the entity required to file a Form 7 in order to adopt an orphan well, citing R.C. 1509.31(A).

{¶21} Appellees respond that the holding of the lease was dependent on production from the orphan well it reworked, not an official transfer in ODNR records. The language merely said if the lessee "decides" to adopt a well and return it to production, then the income would be subject to the same test as a new well (thus, production would preserve the well into the secondary term pursuant to the lease's habendum clause). The lease did not say that, in addition to returning the well to production, the lessee must complete a transfer of ownership of the well within ODNR records by using Form 7 or pursuant to the Ohio Revised Code or the Ohio Administrative Code before the end of the primary term.

{¶22} Appellees note that even if Chapter 1509 were relevant to lease terminology on deciding to adopt a well or an assumption of ownership was required, ODNR would consider Condevco the owner of the well due to its right to produce and its production from the well regardless of any failure to file Form 7. They cite R.C. 1509.01(K) and conclude they became the owner under chapter 1509 by having the right to drill and produce and by attempting to produce and producing, all of which occurred before the end of the primary term. They also cite the deposition testimony of Appellant's expert, who opined ODNR would hold an operator responsible for the future plugging of the well once they attempted to produce from it. Appellees additionally say they can delegate responsibility for bonding and holding the well in ODNR records to Heinrich Enterprises absent a lease clause making such delegation ineffective.

{¶23} ODNR Form 7 is entitled "Request for Change of Owner" and contains an affidavit for the assignor and the assignee. The affidavit of Christy Chavez said an affidavit was filed with ODNR in 2013 to place the well on its bond with Heinrich

Enterprises, but it used an incorrect well number (for a well permitted by an unrelated entity and never drilled). This resulted in production being reported under the wrong well number.[2]  Appellant's own summary judgment evidence shows:  Brian Chavez reported to ODNR that his company previously filed Form 7 to register the well but listed the wrong well number; the error was corrected by ODNR in 2016; and the correction was accomplished through internal emails, suggesting ODNR did not require the submission of a new form (as they had the form listing the incorrect well number).  Appellant argues that using the 2013 filing date claimed by the defense, this official registration occurred after the primary term expired (on June 20, 2012) and was a transfer of ownership to Heinrich Enterprises, not to Condevco.

**{¶24}** The lease does not prohibit an assignment of the lease or a delegation of the lessee's duties.  To prevent assignment of an oil and gas lease by the lessee there generally must be clear contractual language prohibiting an assignment.  *See Harding v. Viking Internatl. Resources Co.*, 2013-Ohio-5236, 1 N.E.3d 872, ¶ 13-14 (4th Dist.), citing *J.G. Wentworth LLC v. Christian*, 7th Dist. Mahoning No. 07MA113, 2008-Ohio-3089, ¶ 40 and *Pilkington N. Am. Inc. v. Travelers Cas. & Sur. Co.*, 112 Ohio St.3d 482, 488, 861 N.E.2d 121 (2006) (assignment is permitted unless it is prohibited by contract, it materially decreases the value or increases the risk, or it is prohibited by statute).  *See also McWreath v. Maiorca*, 2015-Ohio-4319, 46 N.E.3d 156, ¶ 39-45 (11th Dist.) (where ODNR was not notified about the assignment of a lease with a well as required by statute, this does not affect continuation of lease).  "Absent a clause making delegation ineffective, a party may generally delegate his or her duties under a contract."  *Kuhens v. Weaver*, 7th Dist. Carroll No. 643 (Apr. 5, 1996).  *See also Harding*, 2013-Ohio-5236 at ¶ 13 (where the Fourth District spoke of whether the lease clearly prohibited the delegation of duties and the assignment of rights).

---

[2] We note that production from June 2012 would not be reported until the end of March 2013.  *See* R.C. 1509.11(A) ("The owner of any well * * * that is producing or capable of producing oil or gas shall file with the chief of the division of oil and gas resources management, on or before the thirty-first day of March, a statement of production of oil, gas, and brine for the last preceding calendar year in such form as the chief may prescribe.").  The evidence shows ODNR transferred 2014 and 2015 production from the misidentified well number but does not show production for 2012 and 2013.  The defense affidavit said production was reported when they registered the wrong well number in 2013.  In any event, it is not claimed there was no production in 2012 and 2013 (just that the production was not in paying quantities).  And, as explained infra, missing production reports do not mean there was no production.

**{¶25}** Condevco said it delegated to its affiliated company, Heinrich Enterprises, any legal duty to carry a bond and register as owner with ODNR. Both entities are owned by the same four family members (Christy Chavez, her husband Brian, and her parents). Christy testified the affiliated companies had an agreement that Heinrich Enterprises would be the bondholder for all of Condevco's wells (estimated at over 400). As confirmed in an affidavit, all of Condevco's wells are on the bond for Heinrich Enterprises. ODNR did not take issue with the registration of the well owner in the name of an entity who was different than the name on the lease providing the right to drill and/or produce. The defense expert opined it was common in the oil and gas industry "for a well to be held in the name of an operator with ODNR and for the name of the operator to differ from the actual owner of the working interest under the lease."

**{¶26}** According to the statute cited by Appellant, if the entire interest in an oil and gas lease was assigned or otherwise transferred, then the assignor or transferor must notify the royalty holders, and if a well exists on that lease, then the assignor or transferor must notify ODNR of the name and address of the assignee or transferee; this is to be done within 30 days on a form provided by ODNR and verified by both parties. R.C 1509.31(A), now (A)(2). To the extent Appellant suggests this statute imposed an obligation on Condevco to register itself as the owner of the well (in order to exercise its lease option to adopt the well), we note the statute placed the obligation on the transferor. (*See* Reply Brief at 2). It was after this lawsuit was filed that the statute was amended to add that if the transferor failed to notify ODNR, then the transferee shall do so. R.C. 1509.31(A)(3)(a) (eff. 10/17/19). Moreover, the statute refers to existing leases by speaking of an entire *interest in a lease* being assigned or otherwise transferred, rather than an interest in oil and gas being granted or leased (and by speaking of notice to royalty holders). Here, the transaction between Appellant and Condevco was not an interest in an oil and gas lease being assigned or otherwise transferred; rather, it was the grant of a new lease. And, Condevco's arrangement with Heinrich Enterprises was not the assignment of the entire interest in the lease but was a bonding and holding agreement.

**{¶27}** Although Appellant claimed the well was previously in the state's orphan well program, she never cited or discussed the statute on transferring the registration of such a well in ODNR records. R.C. 1509.071 discusses the state's program for plugging

"idle and orphaned wells" which may result in a notice declaring the well an idle and orphaned well and advising to remove equipment as the well is to be plugged. The transfer of an idle and orphaned well places any future responsibility for plugging the well on the bonded entity registered with ODNR; prior to this occurring, a landowner is not responsible for plugging such a well and funds are occasionally allocated by the state to pay for plugging.

**{¶28}** The statute explains: the owner of land on which a well is located who received notice can transfer ownership of the well to an owner meeting financial responsibility requirements, subject to approval of the chief at ODNR. R.C. 1509.071(H) (if the chief approves the transfer, then "the owner" is responsible for operating the well in accordance with chapter 1509 and corresponding rules, including those on well plugging). Notably, this transfer of ownership is subject to "*the landowner's* filing of the appropriate forms required under [R.C. 1509.31]." (Emphasis added.) R.C. 1509.071(H), citing R.C. 1509.31.

**{¶29}** Moreover, Appellant assumed the well was in ODNR's orphan well program because "Historic Owner" was listed in ODNR's records before the owner was changed to Heinrich Enterprises (and the well's status was listed as a historical production well before ODNR changed the status to a producing well). However, it is difficult to presume the landowner received notice under the statute and the well was on the state's list where the evidence submitted by Appellant shows the well status was not categorized as an orphan well by ODNR.

**{¶30}** In any event, the plain language of the lease governs. "The rights and remedies of the parties to an oil or gas lease must be determined by the terms of the written instrument * * *." *Harris v. Ohio Oil Co.*, 57 Ohio St. 118, 129, 48 N.E. 502 (1897). The purpose of contract construction is to ascertain the intent of the parties which is presumed to reside in the language they chose to use in their agreement. *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313, 667 N.E.2d 949 (1996). "If [the court is] able to determine the intent of the parties from the plain language of the agreement, then there is no need to interpret the contract." *Saunders v. Mortensen*, 101 Ohio St.3d 86, 2004-Ohio-24, 801 N.E.2d 452, ¶ 9.

**{¶31}** The lease continues after the primary term while "oil or gas is produced from [the] leased premises" and "if the lessee decides to 'adopt' an orphan well and return it to

production, any royalty income will be considered to have the same effect as a newly drilled well for purposes of this lease." It is the production that holds the lease, not the mere decision to adopt the well. Although the lease places the word "adopt" in quotation marks, it is not a statutory term. Regardless, the lease does not expressly incorporate statutory or regulatory well registration requirements into its terms or define adoption of a well as involving the filing of Form 7. The phraseology of the lease does not impose an obligation on the lessee to institute a statutory transfer of an idle and orphaned well before the end of the primary term, which transfer was to be performed by the *landowner's* filing of forms under R.C. 1509.071. *See also* R.C. 1509.31 (imposing the obligation on an assignor or transferor of a lease interest).

{¶32} The use of the word "and" between the decision to adopt an orphan well and the returning of the well to production, even if suggesting two steps, does not impose a requirement to comply with ODNR notifications in order to maintain the lease. The mere adoption of the well (by attempting production or by a statutory transfer of the well in ODNR records) will not hold the lease as the well must be returned to production under the standard for a newly drilled well in order for that well to hold the lease.

{¶33} Appellant suggests Condevco had to become the well owner under Chapter 1509 before the end of the primary term. As emphasized by Appellees, R.C. 1509.01(K) includes in its definition of owner: a person with the right to drill and to appropriate the oil or gas produced, unless the person obtains an oil and gas lease but does not produce or attempt to produce oil or gas from a well. It is not disputed that Condevco attempted to produce and did produce under the terms of an oil and gas lease.

{¶34} Additionally, we point to the case law on the effect of non-compliance with the provisions in Chapter 1509 on ascertaining compliance with lease terms. For instance, this court has concluded that a failure to file statutorily-required production reports with ODNR does not demonstrate that a well is not producing under the terms of a lease. *Burkhart v. Miley*, 2017-Ohio-9006, 101 N.E.3d 563, ¶ 48 (7th Dist.); *Burkhart Family Trust v. Antero Resources Corp.*, 2016-Ohio-4817, 68 N.E.3d 142, ¶ 23 (7th Dist.); *Mobberly v. Wade*, 2015-Ohio-5287, 44 N.E.3d 313, ¶ 16 (7th Dist.). The Eleventh District has specifically concluded the "lack of compliance with R.C. 1509.31 had no effect upon the continuing validity of the oil and gas lease." *McWreath*, 2015-Ohio-4319 at ¶ 40-41 (the failure to comply with the notification requirement means that the assignment is not

official, but there is no language in the statute indicating that, by failing to satisfy the statute, the lessee loses the ability to assign its rights under the lease). In that case, although an assignment of a lease with an existing well was not registered under R.C. 1509.31, production did not cease, and the court held that the fact that there may be a dispute as to which entity is the lessee does not nullify the fact that the rights under the lease are still being exercised. *Id.* at ¶ 44.

**{¶35}** As compliance with any notice to ODNR under Chapter 1509 (including the associated Form 7) is not a lease term, the failure to file a change of ownership form before the primary term expired did not result in lease termination. Therefore, the identity of the entity who eventually claimed responsibility for the well to ODNR would not determine whether a lease is still valid. ODNR reporting and registration (including the timing of the name transfer and the name used) were not terms of the lease. Condevco (as the original lessee) exercised it rights granted by the lease by reopening an abandoned well, obtaining production before the primary term expired, paying royalties to Appellant, tending the well, and achieving additional production thereafter. (Whether that production was in paying quantities is the next question.) Appellant's first two arguments are overruled.

PAYING QUANTITIES

**{¶36}** The third part of Appellant's sole assignment of error contends she was entitled to summary judgment and the court erred in granting summary judgment to the defense because:

" * * * THE VAN SCHWABEN WELL IS NOT PRODUCING OIL AND/OR GAS IN PAYING QUANTITIES."

**{¶37}** The parties dispute whether the lease terminated because the well failed to produce oil or gas in paying quantities. The lease provides that it extends into the secondary term upon expiration of the three-year primary term as long as oil or gas is "produced from said leased premises" (or from pooled land or drilling operations are continually prosecuted). Although the term "produced" is not followed by the descriptor "in paying quantities," the requirement of "production" in the habendum clause in an oil and gas lease is evaluated under a paying quantities analysis. In other words, the term "produced" in a habendum clause means "produced in paying quantities." *Victor v. Big Sky Energy Inc.*, 2018-Ohio-4666, 124 N.E.3d 283, ¶ 55 (11th Dist.), citing *Tisdale v.*

*Walla*, 11th Dist. Ashtabula No. 94-A-0008 (Dec. 23, 1994) (as the term "produced" means "produced in paying quantities," mere domestic use is insufficient[3]); *Barclay Petroleum Inc. v. Bailey*, 2017-Ohio-7547, 96 N.E.3d 811, ¶ 20 (4th Dist.), citing *Morrison v. Petro Evaluation Servs. Inc.*, 5th Dist. Morrow No. 2004CA0004, 2005-Ohio-5640, ¶ 39. Appellees agree Condevco's production must meet the paying quantities test.

**{¶38}** The Ohio Supreme Court uses a mathematical formula to define paying quantities as those "quantities of oil or gas sufficient to yield a profit, even small, to the lessee over operating expenses, even though the drilling costs, or equipping costs, are not recovered, and even though the undertaking as a whole may thus result in a loss." *Blausey v. Stein*, 61 Ohio St.2d 264, 265-266, 400 N.E.2d 408 (1980) (a profit of less than $1,400 over a six-year base period preserved the lease even though production was intermittent). "Because an oil and gas lessee bears the risk of nonproduction in a lease of this kind, we believe that appellee should be allowed to attempt to recoup his initial investment for as long as he continues to derive any financial benefit from production." *Id.* at 266. Therefore, if there is even a small profit over the chosen period, the lease is maintained. *See id.* (noting the base period was uncontested).

**{¶39}** Initially, we address Appellees' attempt to eliminate all consideration of the report presented by Appellant's expert. Appellees claim the affidavit and report were struck by the trial court and thus Appellant did not meet the burden to set forth evidence showing a lack of paying quantities. Appellees suggest the trial court excluded the opinion of Appellant's expert because he was unreliable, noting such a decision would be reviewed only for an abuse of discretion. We note their supplement in support of summary judgment characterized Appellant's expert report as "useless" due to certain "baseless assumptions" and cited that expert's deposition testimony. Yet, their actual motion to strike was an earlier filing unrelated to this argument; it was based on the inability to depose the expert, which deposition thereafter occurred. Although there is no indication the trial court struck the expert's entire affidavit and report, some items within it may have been considered unreliable or legally incorrect. For instance, some figures were recanted by the expert or admitted to be unrelated to the particular well. The trial court could

---

[3] Although a lessor's mere domestic use is generally not paying quantities, Talbott's lease specified as to her use of free gas: "As long as this use of gas continues to the benefit of the lessor the well will be considered as being in production for purposes of this lease." Condevco ran a gas line to Talbott's house in May 2012, but she refused to use it. (B. Chavez Aff.; B. Chavez Depo. 150, 229, Ex. 11).

properly find those figures unreliable. Other figures were not used by the court because the court held they were not legally attributable to operating expenses, and the correctness of these holdings are reviewed below if dispositive.

{¶40} In making the unreliability argument, Appellees say the expert's opinion essentially imposed an unrealistic minimum volume of gas required for profitable operation. This was based on what he viewed as high operating costs incurred by Condevco. Appellees complain that Appellant's expert accused Condevco of overstating gas production by a factor of 10 based on his viewing of a meter that was not installed until the end of 2015. He acknowledged he had no knowledge of the prior meter, but his opinion also included the period after 2015. We note that some factual issues contested by the parties do not end up being relevant due to the legal analysis infra (on the base period, tolling, and costs includible as operating expenses).

{¶41} Appellees also believe the expert was unreliable due to the following allocations to operating expenses: over $7,000 for the nine days of swabbing in June 2012, instead of recognizing this should be treated as a capital expenditure; $25 as a monthly well tending fee for ten months in 2015 (where well tending was encompassed in compression fees, which were already deducted from the revenue figure); $30 as the labor rate for swabbing (merely because Condevco would charge this amount to other companies), which was not the actual cost of its own employees' labor; $45 per hour for a swab rig rental based on a rate charged to Condevco for another well by an unrelated company, where the rate charged by the affiliated company to unrelated companies was $37.50 per hour in 2013-2014 and $40 per hour in 2015, but the affiliated company (who was the bondholder on the well) did not charge Condevco at all; $133 per year for equipment depreciation (the steel stock oil tank) which was a capital expenditure; $100 per year for liability insurance (where Condevco claimed their insurance did not increase for each well and was thus an indirect cost, but where Appellant's expert said his own company was charged a direct cost of $100 per well in addition to the annual premium); $858 for disposal of the 141 barrels of brine produced when Condevco only paid for disposal of 75 barrels of brine for which it incurred $153 in disposal fees after using its own truck and driver; and the landowners' portion of the severance tax (where the expert admitted he mistakenly attributed to Condevco the entire severance tax when a small amount was the landowner's expense).

Case No. 19 MO 0007

{¶42} We will address these items under the applicable law and evidence presented, if dispositive. We note that Appellant does not take issue with the lack of production between swabbings (before the gas line was installed) but uses the production and operating expenses over a certain base period in urging there was a lack of paying quantities.

{¶43} First, we discuss the effect of production numbers after the lawsuit was filed or the end date of the base period. The parties use different dates for the end of the base period for calculating profitability. Appellant's expert included 2016, 2017, and the first quarter of 2018. As the well was not swabbed in 2016, no oil was produced. The well was swabbed in 2017 where two employees worked 7.5 hours each and attained only 2.4 barrels of fluid. The gas revenue for these two years appears to be less than $300.

{¶44} Appellees moved to stop the base period at the end of 2015 as their lease obligations should be tolled after the lawsuit was filed on January 11, 2016. They argued the time after the complaint was filed should not be utilized in the analysis because they could not be expected to expend money to stimulate production of the existing well or to proceed with plans to drill a well (on this property or pooled property) when they were facing Appellant's request for forfeiture of their investment and the profits. They point to the various allegations made against them in the lawsuit, including lease termination, trespass, accounting, and conversion.

{¶45} The trial court adopted Appellees' position, issuing a judgment which only addressed production through December 2015. Appellees' say the lessor's active assertion of lease termination suspended its obligations, allowing the lease to be tolled in equity to preserve the status quo. They cite this court's statements, such as: "Equitable tolling of the terms of oil and gas leases may be employed by courts to preserve the status quo where the validity of those leases is challenged. * * * The remedy prevents leases from expiring on their own terms while the outcome of litigation challenging the lease is decided by the courts." *Summitcrest Inc. v. Eric Petroleum Corp.*, 2016-Ohio-888, 60 N.E.3d 807, ¶ 44 (7th Dist.) (the trial court abused its discretion in refusing to toll the lease), citing *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1341 (10th Cir.1982).

{¶46} We recently reiterated: "When a lessor actively asserts to a lessee that his lease is terminated or subject to cancellation, the obligations of the lessee to lessor are suspended during the time such claims of forfeiture are being asserted." *Shutway v.*

*Chesapeake Expl. LLC*, 2019-Ohio-1233, 134 N.E.3d 721, ¶ 69 (7th Dist.) (interference by the lessor which justifies extension of the lease includes repudiation by clearly challenging the lessee's right to continue after the primary term in a lease with a drilling operations savings clause), quoting *Yoskey v. Eric Petroleum Corp.*, 7th Dist. No. 13 CO 42, 2014-Ohio-3790, ¶ 46, quoting *Jicarilla Apache Tribe*, 687 F.2d 1324 (the purpose is not to punish the landowner for asserting lease invalidity but to suspend obligations in the face of a clear repudiation).

{¶47} Although the chart copied into Appellant's brief from the expert's report covers a longer period, Appellant does not specify an argument that it was erroneous to toll the obligation under the lease by considering only the time prior to the filing of the lawsuit. Nor does Appellant frame the issues as involving the length of the base period. We recognize that production and expenses after a lawsuit is filed are not automatically excluded from consideration in the paying quantities analysis, and this court has evaluated post-filing evidence where tolling was not sought or was inappropriate. However, Appellees requested tolling in its summary judgment motion. It is noted that this case involves a new lease without the drilling of a new well where the lease entered the secondary term through the adoption of an old, abandoned well which was reopened as a swab well.

{¶48} In this case: this lease could be maintained by production from a reopened orphan well; the adopted well was a swabbed well as this method was found to be required for its future production; the lease also provided the right to drill a new well and the right to preserve the lease by continuously prosecuting drilling operations on a new well; Appellant acknowledged in her deposition testimony that a representative from one of the defendants (Flatrock) approached her about his company's plans to drill a well on her property; she disclosed that she did not want a well on her property; she filed this lawsuit setting forth claims that included lease termination, trespass, conversion, accounting, and ejectment; and the lessee asked the court to use the date of the complaint in this lawsuit as the end date of the base period or as the date of the lessor's repudiation, akin to a tolling order. The facts presented in this case warranted tolling the lease obligations and thus ending the base period for the paying quantities analysis as of the date the lawsuit was filed rather than holding against the lessee any post-lawsuit failure to produce from the orphan well (or failure to prosecute new drilling operations).

**{¶49}** As for the beginning of the base period, both sides utilize the production obtained from the June 2012 swabbing for revenues. The chart in Appellant's brief from her expert's report contains high operating expenses in 2012 due to the expert's assignment of labor and swab rigs costs for the nine days spent swabbing the well in June 2012. The report estimated Condevco incurred $7,000 in operating costs for these nine days of swabbing. Below, Appellees argued those expenses should be considered capital expenses as they were part of reopening an old well (abandoned by others). They equated the initial work (of stimulating and evaluating production) to a drilling or equipping cost, which is not an operating expense, or to reworking a well (such as by replacing a pump), which is also not an operating expense. *See Blausey*, 61 Ohio St.2d at 265-266 (the capital investment is not an operating expense in the paying quantities equation); *Paulus*, 2017-Ohio-5716 at ¶ 61 (recurring production costs are operating expenses, but the cost to rework a well, by replacing the downhole pump and rebuilding the wellhead, was a non-recurring, capital investment to be excluded from operating expenses as an equipping cost).

**{¶50}** Appellant did exclude from operating expenses the initial reopening costs incurred in May 2012 (such as pump removal and replacement, unsuccessful swabbing attempts followed by bailing of the well bore, and the pulling and replacement of the tubing) and the costs incurred in the November 2014 equipping of the well with a gas line running to a combined line with a compressor, apparently recognizing these were equipment or capital expenses rather than operating expenses. *See Paulus*, 2017-Ohio-5716 at ¶ 56 ("The definition of paying quantities set forth in *Blausey* excludes drilling and equipping costs from operating expenses."). Yet, Appellant believed that the June 2012 swabbing (after the bailing) should be treated as an operating expense because it resulted in the very production used to maintain the lease past the primary term.

**{¶51}** The trial court disagreed. In June 2012, Condevco was still evaluating the well to ascertain if it could even be used as a swab well. As the trial court pointed out, the well was swabbed one or two times a year after the initial production, supporting a conclusion that the nine days of swabbing in June 2012 were still part of the initial expenditure to clear and stimulate the well and ascertain its future. The swabbing of fluid from an old well was said to stimulate not only future oil and increase the percentage of oil in the fluid but also to clear the path for gas (which may cyclically be blocked by rising

fluid, calling for the next swabbing). The fact that the stimulation of an abandoned well by heavy swabbing (after the bailing of the debris from the hole) resulted in production of oil does not eliminate the initial capital expense, just as the capital expenditure of drilling that produces oil does not turn the capital expenditure into a production cost. Where a lessee who is in the process of adopting and reopening an abandoned well repeatedly performs swabbing over a two-week period in order to ascertain if production was possible, any direct expenditures incurred in swabbing during these days were not operating costs but were part of the initial reopening cost.

**{¶52}** We also note the issue was not specifically briefed as an error. Besides using the chart of her expert in her brief, Appellant does not express disagreement with the explicit holding related to the categorization of the June 2012 swabbing events. Appellant does not specifically argue the trial court erred in refusing to classify the June 2012 swabbing as an operating expense or cite law on operating expenses as it relates to reopening and stimulating a well abandoned by another. Appellant refers to swabbing logs and costs, but this is in the context of her specific argument that internal employee costs are operating expenses as are the costs for use of the swab rig. We now turn to these issues.

**{¶53}** On the swab rig used from 2013 through 2015, the affidavit of Brian Chavez said Condevco used its own swab rig and had no overhead traceable to the expense of producing the well. It was thereafter explained that the swab rig was actually owned by Heinrich Enterprises. Christy Chavez testified at deposition that both companies were owned by the same four people (her, her husband, and her parents). Her second affidavit said the normal rate charged by Heinrich Enterprises for the rig was $37.50 per hour in 2013-2014 and $40 per hour in 2015. This was to contest the $45 per hour rate used by Appellant's expert based on his viewing of a receipt for a rig rental of a different type paid to a different company (which was not owned by her or her husband). At deposition, the expert acknowledged his report for the well on Talbott's property used this figure even though the receipt was for a different well on another landowner's property.[4]

---

[4] A lawsuit was filed by that other landowner against Condevco where: that plaintiff retained the same attorney and expert as the plaintiff in this case; discovery was simultaneously conducted; and the depositions filed in this case contain testimony on the wells in both cases. *See Christman v. Condevco Inc.*, 7th Dist. No. 19 MO 0008, 2020-Ohio-___ (not involving a swab well).

**{¶54}** The trial court opined that by "using their own swab rig * * * [the defendants] have not incurred any 'direct expenditures from gross receipts' that would be included in their operating costs." The trial court also noted the swab rig rate of $45 per hour used by Appellant's expert was not relevant to the rig used in this case.

**{¶55}** Appellees do not dispute that if a company rents a piece of equipment for episodic production or regular maintenance, the rental cost would be a direct operating expense. They acknowledge, "When the Talbott Well is swabbed in the ordinary manner (once or twice a year) in order to maintain production, it is an operating expense." (Appellee Brief 30). However, they say the trial court correctly refused to impute an operating expense for the use of the swab rig because: a company using its own rig does not incur a direct operating cost in the form of a rental fee when maintaining production by swabbing (in place of pumping); the swab rig was owned by an affiliated company, Heinrich Enterprises, which had the same owners as Condevco and which held the bond on the well; and Heinrich Enterprises did not charge Condevco for using the rig.[5]

**{¶56}** Where a company used its own rig to assist in the regular servicing of a well, a California court concluded that a fair rental value for its use need not be assigned as an operating expense in the paying quantities analysis. *West v. Russell*, 12 Cal.App.3d 638, 644, 90 Cal.Rptr. 772 (1970).

**{¶57}** We have explained that operating expenses can be direct and indirect but only direct operating expenses are part of the paying quantities formula. "[I]n a 'paying quantities' analysis, we look to direct operating costs and exclude any indirect costs that do not contribute to the production of oil or gas." *Hogue v. Whitacre*, 2017-Ohio-9377, 103 N.E.3d 314, ¶ 27, 31 (7th Dist.), citing *Paulus*, 2017-Ohio-5716 at ¶ 54, citing 6 William & Myers, *Oil and Gas Law*, Section 604.5 (2012), fn. 4 (federal interpretation of operating expenses includes only "direct" lease operating costs). The indirect costs of generally operating a company are not included as operating expenses for a particular well. *See Hogue*, 2017-Ohio-9377 at ¶ 28 (overhead or administrative expenses are indirect expenses).

---

[5] Appellees alternatively state that even if Heinrich Enterprises's normal swab rig rental rates are imputed to operating costs for this well, they still made a profit from June 2012 through the end of 2015. However, this contention depended on the trial court's incorrect decision excluding all labor costs from the calculation (which is the last topic discussed infra).

**{¶58}** Although a piece of machinery brought to the site as a regular method of producing oil and releasing gas will contribute to the production of the well, the purchase of the machinery is a one-time, capital expense. This is distinct from any disposable items used in the swabbing. As Appellee recognizes, Appellant's expert properly included as operating expenses the cost of the swab cups from 2013-2015 (53 cups at $4.35 each). The cost of the cups was a direct expenditure used for this one well.[6] To the contrary, as a matter of law, the ownership of the swab rig was a capital expense for an entire business.

**{¶59}** The rig was attributable to many wells over time and was not purchased for just this well. Since *Blausey* instructs that we not consider the capital investment, we would not consider depreciation on equipment that was part of that investment. Thus, depreciation on an oil holding tank should not be included as an operating expense, just as depreciation on corporate-owned machinery such as a swab rig or a truck would not be included.

**{¶60}** In sum, where a lessee owns its own swab rig (which is used a few times a year at a planned swab well) a fair market rental rate for the rig is irrelevant and need not be attributed to operating expenses in the paying quantities analysis. This premise extends to cases where the same four individuals own both the company who used the rig and the company who owned the rig and the latter company did not charge for the use of the rig.

**{¶61}** Excluding the swab rig rental rate from operating expenses leaves the value of labor as a dispositive question. The gross revenue figure used by the parties from 2012-2015 was $3,956.90, with marketing and compression fees already subtracted from this figure (with Condevco's acquiescence). Appellees acknowledge Condevco's operating expenses include: $434 in royalties; $231 for swab cups; $230 in severance tax ($240 minus $10 for the landowner's share); and $154 in brine disposal.

**{¶62}** Appellant's main argument is that the trial court incorrectly excluded from operating expenses the cost of Condevco's own employees during swabbing. Appellant contends this exclusion of labor from operating expenses violated the precedent set forth by this court in *Paulus*. In that case, Beck Energy previously reported operating costs for

---

[6] A fuel cost attributable to the use of the swab rig was not estimated by Appellant's expert.

a well by including the time a salaried employee spent at the well but stopped accounting for this time when the price of oil and gas fell. *Paulus*, 2017-Ohio-5716 at ¶ 62. We observed: "It was treated as a direct expense attributable to production from this well, just as it would have been if an independent contractor performed the service. We agree Appellant artificially deflated its operating expenses, which was a relevant consideration in the paying quantities analysis." *Id.* at ¶ 64.

**{¶63}** We recognized that the Supreme Court found an individual lessee's own free labor was not an operating expense because he personally performed all the labor necessary to produce oil from the leasehold and made no direct expenditures from gross receipts for labor. *Id.*, citing *Blausey*, 61 Ohio St.2d at 266. The Supreme Court said, "The fact that a lessee can keep operating costs at a minimum should inure to his benefit in a determination of whether a well produces in paying quantities." *Id.*, citing *Weisant v. Follett*, 17 Ohio App. 371 (7th Dist. 1922). However, we refused to extend the *Blausey* principle to a corporation's employee who received payment for his work on the well.

**{¶64}** Appellees claim: *Blausey* excludes the lessee's own labor from the operating expenses; Condevco's internal employee's labor is akin to the lessee's own labor; Condevco never treated its employee's labor as an operating cost; and our *Paulus* holding was limited to a case where the lessee previously treated its employee's labor as an operating cost. However, the *Paulus* case went to trial. Our discussion of the prior accounting for employee labor on the well had to do with the reasonableness of the fact-finder's assignment of value for the calculation; the past recorded internal cost of labor to operate the well was a consideration in adjudicating the actual cost where other evidence was not before the court. The point was: where a paid employee spent time maintaining the well (other than drilling, equipping, or reworking), some labor cost was incurred regardless of whether the bookkeeping department decided to stop charging the well for the labor for accounting purposes.

**{¶65}** This court essentially concluded that when a corporation hires an employee to perform tasks related to recurring well production activities (such as pumping), the cost for that employee's labor is a direct expenditure from gross receipts and not akin to free personal labor performed by an individual lessee. *Paulus*, 2017-Ohio-5716 at ¶ 63 (distinguishing *Blausey* where the individual lessee physically performed the work at the well). Although we also emphasized that even the lessee previously labeled its employee

costs as operating expenses, we specifically held: "Labor directly related to production is considered an operating expense; the portion of labor incurred for lifting costs represents a periodic cash expenditure incurred in the daily operation of the well." *Id.*

**{¶66}** The trial court therefore erred in refusing to attribute to Condevco's operating expenses the hours of swabbing labor in 2013-2015, which was used as the recurring method to produce oil and gas. After the initial opening of a well that was abandoned by others, Condevco paid its employees to conduct planned well swabbings once or twice a year (to decrease fluids in the hole, obtain the only source of oil, and release gas). The employees tracked their hours at the well during the swabbing. This was an expenditure that was directly related to production.

**{¶67}** Nevertheless, this does not mean the labor rate used in the report of Appellant's expert was legally justifiable. Christy Chavez testified that the rate Condevco charges to other companies for an employee's labor was $30 per hour. (C. Chavez Depo 22-24). She agreed this figure accounts for items including the employee's pay, health insurance, use of a company truck, payroll taxes, and optional retirement contributions with an employer match. (C. Chavez Depo. 72-75). In a subsequent affidavit, Christy Chavez noted that the $30 labor rate also included profit, stating: "Like any other business, the rates charged to third parties exceed Condevco's actual cost so Condevco can earn a profit for its services." Appellants's expert used $30 because this was the labor rate charged by Condevco (to its affiliates and to other companies), and he noted this rate was within industry standards. However, Condevco was not charged this rate for the work at issue as Condevco used its own employees to swab the well (and for other labor on the well).

**{¶68}** Although Appellant is correct that labor is an operating expense, Appellant is incorrect that the law requires the labor rate for a company's own employees to be imputed at the fair market rate for outside workers. As a matter of law, it is only the actual, direct (and non-capital) expenditures for producing the well that we evaluate in arriving at a figure for operating expenses related to labor.

**{¶69}** Certain benefits such as health insurance and retirement programs are akin to overhead expenses involved in running a business. As for an employee's use of a company truck, the cost of the truck would involve a capital or depreciation type of expense. *See* analysis supra. And, the insurance on the truck would be an indirect or

overhead expense. *See Hogue*, 2017-Ohio-9377 at ¶ 24-25. Any direct fuel cost attributable to driving the company truck to this one well to participate in the 2013-2015 swabbings was not itemized by Appellant's expert.

**{¶70}** An employee who worked on the subject well testified he earned $10.50 or $11 per hour in 2012. In 2015, he was paid $14.50 per hour at the beginning year, received a raise to $15 an hour in the middle of the year, and received a raise to $15.50 an hour in December of that year. (McKnight Depo. 41). Even if we were to assume that his rate of pay was the same in 2013 and 2014 as at the beginning of 2015, the deduction for actual labor for the 2013-2015 swabbing events would be $1603.[7]

**{¶71}** If we conduct a calculation on other figures and assume certain contested categories should be included, the well still shows some profit. For this projection and to ascertain the legal effect of certain contested figures, we have generally used some of the figures urged by Appellant without deciding the propriety of using such figures. As stated above, if a collection of minor items would not be dispositive in a calculation, we need not rule on the merits of each item. Beyond the items we specifically ruled on above, Appellant would have us add the following items to operating expenses: an additional brine disposal fee of $137 (due to tank measurements showing an additional trip must have been made); the labor for brine hauling in Condevco's vehicle (but only Condevco's actual labor rate paid to the employee could be used, not the cost of hiring an outside truck and driver); well tender fees[8] to read the gas meter ten times before the lawsuit was filed; an annual insurance premium[9] of $100; and the employer's portion of payroll taxes

---

[7] The report of Appellant's expert relied on tables he attached. In attachment 2, he listed the swab rig as being used for 8 hours one day in April 2013; he then used 24 hours for swab rig labor after multiplying the rig hours by the number of employees. However, attachment 6, which he used to obtain the number of employees working at the site, shows only two employees were present that day, meaning only 16 labor hours were attributable to the April 2013 swabbing.

[8] The rate of $25 per visit imputed by Appellant's expert was based on what he pays an independent contractor to visit a well and read the gas meter. However, as set forth supra, such a rate is not legally justified where an employee was utilized for the well tending and his maximum hourly rate is known. The well was tended by a Condevco employee who spent ten minutes or less at the well for this type of visit and whose hourly rate was much less than the contract rate paid by the expert. Moreover, Appellant does not discuss Condevco's affidavit saying the well tender fees were included in the compression costs, which were already subtracted from revenues.

[9] Contrary to Appellee's suggestion Appellant's expert did not attempt to attribute the indirect cost of general liability insurance to the well. Rather, he said liability insurance on the well was required and he is charged $100 per well charge in addition to general liability insurance. Condevco says it does not pay an additional

attributable to employees for the hours spent swabbing this well. (Again, we are not expressing agreement with the figures or categories.)

{¶72} Even using these figures, there would still be a small profit. The *Blausey* test instructs that a well is in paying quantities regardless of how small the profit is. *Blausey*, 61 Ohio St.2d at 265-266 (quantities of oil or gas sufficient to yield the lessee a profit, no matter how small, over operating expenses, even though drilling or equipping costs are not recovered and the undertaking as a whole thus results in a loss). In conclusion, we find the well was adopted under the terms of the lease and the well was producing in paying quantities. Accordingly, we affirm the entry of summary judgment.


Waite, P.J., concurs.

D'Apolito, J., concurs.

---

premium per well, but Heinrich Enterprises is the bondholder. We note the first of the four years was a partial year.

Case No. 19 MO 0007

[Cite as *Talbott v. Condevco, Inc.*, 2020-Ohio-3130.]

---

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Monroe County, Ohio, is affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## **NOTICE TO COUNSEL**

**This document constitutes a final judgment entry.**